**Mary Emma WARD et al., Plaintiffs,**

**v.**

**Arthur WINSTEAD et al., Defendants.**

**No. GC 6829.**

United States District Court,
N. D. Mississippi,
Greenville Division.

July 1, 1970.

James M. Abram, Jackson, Miss., for plaintiffs.

Will S. Wells, Asst. Atty. Gen., Jackson, Miss., H. Talbot Odom, Greenwood, Miss., for defendants.

Before GEWIN, Circuit Judge, and KEADY and SMITH, Judges.

KEADY, District Judge:

Plaintiffs, black recipients of public assistance under the Mississippi Aid to Dependent Children (ADC) Program, and residents of Leflore County, Mississippi, bring this action under 42 U.S.C. § 1983 against the Commissioner of Public Welfare of the State of Mississippi, the members of the State Board of Public Welfare, and the Leflore County Welfare Agent, attacking the validity and constitutionality of: (1) the Mississippi administrative regulations[1] restricting ADC recipients to 30% of computed need, and (2) the Mississippi statute limiting grants to each ADC family to $30 for the first child, $18 for the second and $12 for each subsequent child.[2]

■ Plaintiffs seek a judgment declaring that the administrative regulation contravenes both the Mississippi Welfare Statute[3] and the Social Security Act,[4] that the state statute violates the Social Security Act, and that the regulation and state statute are unconstitutional as violative of the Equal Protection and Due Process Clauses of the Fourteenth Amendment. Plaintiffs invoked jurisdiction under 28 U.S.C. § 1343 (3) and (4) and requested the convening of a three-judge district court pursuant to 28 U.S.C. §§ 2281 and 2284 because of plaintiffs' prayer to enjoin the enforcement, operation and execution upon the ground of unconstitutionality of the state's administrative regulation and statute. A three-judge court was properly convened. King v. Smith, 392 U.S. 309, 88 S.Ct. 2128, 20 L.Ed.2d 1118 (1968).

Plaintiffs Ward and Winston are each mother and sole support of two eligible children. Ward's monthly budgetary deficit is $162.30, and Winston's is $187.[5] After application of percentage reduction alone, Ward would receive $48.69 and Winston $56.10 per month. Applying the per child maxima to those figures, each family actually receives $48

---

1. Miss.Manual of Public Assistance, Vol. III, Sec. E, at pp. 5700–5701, 5800–5882. At the time this action was filed on July 12, 1968, the percentage allowable was 27%; effective January 1, 1969, it was raised to 30%.

2. Miss.Code Ann. § 7173, as amended July 30, 1968, provides as follows:

"The amount of assistance which may be granted for any dependent child shall be determined by the county department with due regard to the resources and necessary expenditures of the family and the conditions existing in each case, and in accordance with the rules and regulations made by the state department, and shall be sufficient when added to all other income (except that any income specified in the Federal Social Security Act, as amended, may be disregarded) and support available to the child to provide such child with a reasonable subsistence compatible with decency and health. *The first dependent child in each family may receive an amount not to exceed Thirty Dollars ($30.00) per month; the second child may receive an amount not to*

*exceed Eighteen Dollars ($18.00) per month; and each additional child an amount not to exceed Twelve Dollars ($12.00) per month,* provided that the maximum for any individual child may be exceeded for foster or medical care or in cases of mentally retarded or physically handicapped children." (Emphasis added)

At the time this suit was filed, the maximum statutory amounts allowable were $25 for the first child, $15 for the second child and $10 for each additional child in the family.

3. Miss.Code Ann. § 7171 et seq.

4. 42 U.S.C. § 601 et seq.

5. Budgetary deficit consists of: (1) a uniform state list of goods and services necessary to survive in health and decency; (2) county determination of total cost of these items; and (3) subtraction of any income or other sources available. See Mississippi Manual, Vol. III, Sec. E, at pp. 5200–5203, 5812–13 and 5883. (Budgetary deficits of the plaintiff families have been verified by the Leflore County Welfare Department.)

per month.[6] Plaintiff Lockett, mother of six eligible children, has a budgetary deficit of $250 per month. By operation of the percentage reduction rule alone her family receives $75 per month, less than the $96 statutory maximum. Plaintiff Winters, mother of seven eligible children, has a deficit of $185, 30% of which is $85, which is less than the $108 maximum. Thus, the Lockett and Winters families are not affected by the per child maxima. (See table, Fn. 6).

Plaintiffs sue on behalf of themselves, their minor children and all Mississippi ADC recipients similarly situated. Plaintiffs admit lack of standing to attack the $108 per family maximum regulation because no plaintiff has 8 or more eligible children.

After extensive discovery and submission of pre-trial memoranda, trial on the merits was conducted at Biloxi, Mississippi, on May 19, 1969. The parties promptly submitted post-trial briefs, but a ruling in the case was stayed pending a decision of the Supreme Court of the United States in an appeal taken in Williams v. Dandridge, 297 F.Supp. 450 (D.C.Md.1968), which involved similar questions, and it was not until April 6, 1970, that the Supreme Court gave its pronouncement in *Dandridge* by reversing the decision of the three-judge district court and upholding the Maryland maximum family grant provision.[7]

Mississippi participates in, and administers, four categories of public assistance: Old Age Assistance (OAA),[8] Aid to the Blind (AB),[9] Aid to the Permanently and Totally Disabled (APTD),[10] and Aid to Dependent Children (ADC).[11] The ADC program is administered by the State through its Board of Public Welfare pursuant to the Social Security Act, 42 U.S.C. § 601 et seq., and in accordance with regulations promulgated by the Board under authority of State statutes. It has been stipulated[12] that in determining financial needs of recipients, Mississippi uses a standardized budget of costs and expenses which applies uniformly to all four categories, so that budgetary deficits are determined in a consistent man-

6. The 30% reduction rule and § 7173 maxima synchronize only upon stated budgetary deficit as follows:

| Amount of Deficit | Size of Family | 30% Yield | Statutory Maximum |
|---|---|---|---|
| $100 | 1 ADC child | $30 | $30 |
| 160 | 2 " children | 48 | 48 |
| 200 | 3 " " | 60 | 60 |
| 240 | 4 " " | 72 | 72 |
| 280 | 5 " " | 84 | 84 |
| 320 | 6. " " | 96 | 96 |
| 360 | 7 " " | 108 | 108 |

If, in each category, the deficit is less than the stated figure, the maximum will not operate, but if the deficit exceeds the stated figure, the maximum will operate, and the ADC grant will be reduced to less than 30%.

———————◆———————

7. Dandridge v. Williams, 397 U.S. 471, 90 S.Ct. 1153, 25 L.Ed.2d 491, 1969.

8. Miss.Code Ann. §§ 7214–7247, as amended.

9. Miss.Code Ann. §§ 7248–7269.

10. Miss.Code Ann. §§ 7270–7290, as amended.

11. Miss.Code Ann. §§ 7171–7284.5–06, as amended.
The program's original designation by

dren", 49 Stat. 627, and Mississippi's program still has that title, despite the fact that in 1962 the federal statute amended the name of the program to "Aid and Service to Needy Families with Children", 76 Stat. 185, and the program is now often referred to as "Aid to Families with Dependent Children", or AFDC.

12. See pre-trial order dated December 2, 1968.

ner; in ADC cases, the State's estimate of need recognizes that it requires less to raise a child in a household with two or more children than with only one child. Stated more generally, the economics of scale of raising children are built into the State's determination of need.

The recipients in the OAA, AB and APTD programs currently [13] receive 100% of their budgetary deficit unless it exceeds $55 per month, which is the administrative ceiling. In the average case, the adult recipient is not materially affected by that ceiling.[14] No percentage limitation is imposed on any category of public assistance other than ADC. This has not always been true. Prior to 1956 there were, in most years, percentage limitations on OAA and AB grants, and prior to 1963 on APTD grants.[15]

For the year 1968 the following percentage of "average budgetary deficit" paid by "average grant" of public assistance was: OAA 84.7%, AB 77.3%, APTD 80.5% and ADC 26.8%.[16] The average payment to an ADC recipient was $8.50; the average payment to an ADC family was $34.85; and the average ADC family budgetary deficit was $129.41.[17] By contrast, average payments amounted to $36.13 to OAA recipients, $44.63 to AB recipients, and $44.56 to APTD recipients.[18] Since 1948 average payments to OAA, AB and APTD recipients have more than doubled, while the average ADC payment is less now than it was 20 years ago. State officials attribute this to the necessity of disbursing available funds among the rapidly expanding ADC rolls, which have steadily increased since Mississippi first inaugurated the ADC program on May 10, 1940.[19] The striking increase in the

13. Prior to March 1969, the recipient of the three "adult" categories were limited either by statute or regulation, to $50 per month.

14. As of April 1968 the average budgetary deficit of recipients of the adult categories were as follows:

| OAA | AB | APTD |
|---|---|---|
| $42.65 | $57.73 | $55.34 |

15. See defendants' answers to plaintiffs' interrogatories Nos. 1 and 2.

16. The previous five-year period shows percentage of average budgetary deficit paid by average grant to be as follows:

| | OAA | AB | APTD | ADC |
|---|---|---|---|---|
| 1963 | 93.9% | 87.9% | 86.9% | 36.4% |
| 1964 | 93.1% | 87.5% | 89.3% | 37.8% |
| 1965 | 91.8% | 86.7% | 88.6% | 34.2% |
| 1966 | 87.9% | 82.0% | 84.5% | 29.7% |
| 1967 | 86.0% | 81.0% | 86.4% | 30.2% |

(Answer to Interrogatory No. 8)

17. Average payment figures are as of March 1968, pre-trial order. Figure for average budgetary deficit is as of April 1968, as per answer to Interrogatory No. 6.

18. As of April 1968. (Answer to Interrogatory No. 6).

19. The Enabling Act was Chap. 294 Miss. Laws of 1940, and the original appropriation including ADC assistance was Chap. 57 Miss. Laws of 1940.

number of ADC recipients, totaling 87,-000 as of May, 1969, is shown below.[20]

Of the Mississippi expenditures for public welfare,[21] 62.4% is expended on OAA, 2.6% on AB, 17.3% on APTD, and 17.3% on ADC. During the six years prior to the last appropriation, the State legislature had limited ADC expenditures to not more than 3.2 million dollars per biennium, but this limitation was removed in 1968.

Plaintiffs attack Mississippi's ADC program upon a number of grounds. First, they contend that the administratively imposed percentage reduction and the statutory maximum grant limitations, both separately and operating together, violate the Equal Protection Clause of the Fourteenth Amendment, and also such provisions discriminate against Negro recipients without rational justification, thus denying plaintiffs equal protection of the laws. Next they assert the 30% reduction rule contravenes the State statute, § 7173, and that both percentage reductions and statutory maxima conflict with the Social Security Act.

Federal jurisdiction of challenges by welfare recipients to State statutes and regulations is now well-established. *Dandridge*, supra; see Note, "Federal Judicial Review of State Welfare Practices", 67 Col.L.Rev. 84 (1964).

## I. STATUTORY CLAIMS

### A. *The Mississippi Statute*

In accordance with the directions of the Supreme Court,[22] we consider first the pendent statutory claims. Plaintiffs argue that the State Welfare Department's regulation (Fn. 1, supra), which limits ADC payments to 30% of budgetary deficit, violates the Mississippi ADC statute (Fn. 2, supra). As stated, they do not presently challenge the administrative order which places a family maximum of $108 on ADC grants.

The court notes at the outset that it has found no case in which a welfare regulation was struck down as violative of a state statute. The three-judge district court in *Dandridge* mentioned in a footnote that plaintiffs there had alleged violations of the Maryland statute, but did not rule on the question since plaintiffs had not pursued it. Williams v. Dandridge, 297 F.Supp. 450 at 456, note 13 (D.C.Md.1968).

Since § 7173 states that payments to each ADC child (when added to other income) "shall be sufficient to provide such child with a reasonable subsistence compatible with decency and health", plaintiffs urge that this language requires in specific terms that each ADC child receive no less than 100% of his subsistence needs, i. e., his budgetary

---

20. Available figures for the month of January in each of the years 1942 through 1968, as set forth in defendants' answer to Interrogatory No. 7, show the following number of persons to have been ADC recipients:

| 1942 | 6,756 | 1951 | 30,992 | 1960 | 58,652 |
|------|-------|------|--------|------|--------|
| 1943 | 6,252 | 1952 | 29,602 | 1961 | 61,222 |
| 1944 | 6,858 | 1953 | 30,695 | 1962 | 62,745 |
| 1945 | 7,461 | 1954 | 36,488 | 1963 | 62,773 |
| 1946 | 8,192 | 1955 | 46,496 | 1964 | 64,251 |
| 1947 | 11,917 | 1956 | 33,661 | 1965 | 65,382 |
| 1948 | 15,007 | 1957 | 36,792 | 1966 | 67,223 |
| 1949 | 19,266 | 1958 | 44,693 | 1967 | 71,152 |
| 1950 | 27,062 | 1959 | 52,512 | 1968 | 84,557 |

---

21. 33 million dollars were jointly appropriated for the four categories of public assistance, including cost of administration, for the fiscal biennium 1968–70, by House Bill No. 1328, Mississippi Laws, Regular Session, 1968.

22. See Rosado v. Wyman, 397 U.S. 397, 90 S.Ct. 1207, 25 L.Ed.2d 442 (1970), and Wyman v. Rothstein, 398 U.S. 275, 90 S.Ct. 1582, 26 L.Ed.2d 218, June 1, 1970.

deficit. Several factors rebut this argument. First, the very next sentence of § 7173 places per child maxima on all ADC grants. This subsequent specific language forbidding payment to any recipient of such portion of his budgetary deficit as exceeds the stated amounts clearly modifies and qualifies the quoted general words which seem to imply that recipients should receive their entire needs. Also, § 7173 expressly provides "the amount of assistance" shall be determined "in accordance with the rules and regulations made by the state department." Thus the statute is at least ambiguous, if not self-conflicting. The record clearly shows that the Mississippi legislature has never appropriated sufficient funds to pay ADC recipients 100% of budgetary deficit. Operating under the predecessors of the present statute, which had the same language on payment of subsistence needs, the Welfare Department for more than 20 years paid ADC recipients less than 100% of budgetary deficit due to lack of funds. This practice, which must have been known to the state legislature, was tacitly approved by it when it re-enacted the statute in 1968 (Ch. 562, § 3) without changing the provisions concerning subsistence.

■ The above factors strongly indicate that the statute's general language, relied upon by plaintiffs, did not require the Welfare Department to pay each recipient 100% of his budgetary deficit, but was rather a general statement of the goal of the ADC program, which the Welfare Department was bound to pursue within the financial limitations placed upon it by subsequent legislative appropriations.[23] The language of § 7173 also reflects that the broad discretion which a state possesses in setting standards of need and levels of benefits, as outlined in King v. Smith, supra, was delegated by the Mississippi legislature in § 7173 to the State Welfare Department. Since the legislature has not appropriated funds adequate to pay all ADC recipients 100% of budgetary need, even after imposition of the $30–18–12 per child maximum grant limitation, it is clear that the legislature intended the Welfare Department to have discretion in adopting such measures as it deemed proper, within constitutional bounds, to distribute the limited amount of funds available pursuant to the goal of the program. Thus, we reject the contention that the State's percentage reduction rule is in conflict with the Mississippi ADC statute.

**B.** *The Federal Statute*

■ Plaintiffs next assert that both the percentage reduction regulation and the maximum grant statute violate the Federal Social Security Act, 42 U.S.C. § 601 et seq., in that they are inequitable to plaintiffs, bear no rational relationship to the purpose of the federal statute, contravene its purpose, and are therefore void. We first consider the concept of percentage reduction. Although several recent cases have discussed percentage reductions in ADC payments, no court has to date expressly ruled on the compatibility of percentage reductions with the federal statute. The question in Lampton v. Bonin, 299 F. Supp. 336 (D.C.La., 3-judge, 1969), subsequent opinion 304 F.Supp. 1384 (1969); vacated and remanded 397 U.S. 663, 90 S.Ct. 1408, 25 L.Ed.2d 644 (1970), and Jefferson v. Hackney, 304 F.Supp. 1332 (D.C.Tex., 3-judge 1969); vacated and remanded 397 U.S. 821, 90 S.Ct. 1517, 25 L.Ed.2d 807 (1970), was whether the imposition of percentage reductions in reaction to the federally-required "cost-of-living" increases in ADC payments violated 42 U.S.C. § 602(a) (23). That question does not arise in the case at bar, since Mississippi fully and voluntarily complied with the required "cost of living" increases on July

---

23. A conflict, should there be any, between the literal words of the Mississippi ADC statute implying a goal of paying subsistence to the child and the Federal ADC statute, 42 U.S.C. § 601 et seq., whose primary purpose is to keep families together, must be resolved in favor of the latter. Cf. Fn. 11.

1, 1969 by raising its allowable percentage of need from 27% to 30%, its per family maximum from $96 to $108, and its per child maxima from $25–15–10 to $30–18–12. The question here presented is thus unrelated to the federal statutory considerations in *Lampton* and *Jefferson*, and is limited to the compatibility vel non of percentage reductions with the federal statute.

Although no court has passed upon the precise question we now consider, it has been the subject of recent judicial comment. In discussing the purpose and effect of the new "cost of living" amendment in *Rosado*, supra, 90 S.Ct. 1207 at 1218, 25 L.Ed.2d at 456, Mr. Justice Harlan stated for the majority that:

> "Congress has introduced an incentive to abandon a flat 'maximum' system, thereby encouraging those States desirous of containing their welfare budget to shift to *a percentage system which will more equitably apportion those funds in fact allocated for welfare and also more accurately reflect the real measure of public assistance being given.*" (Emphasis added) [24]

Thus, though no court has yet been directly faced with the question, strong dicta indicate that percentage reductions are considered more equitable than family maxima, which were themselves approved in *Dandridge*.

As stated in 42 U.S.C. § 601, the purpose of the federal statute is:

> "* * * [E]ncouraging the care of dependent children in their own homes or in the homes of relatives by enabling each state to furnish financial assistance and rehabilitation and other services, *as far as practicable under the conditions in such state.* * * *"* (Emphasis added)

The percentage reduction rule appears to be the fairest and best method for complying with the purpose of the federal statute, within the State's financial limitations, because it does not "cut off" or exclude any child or class of children or families, but treats all alike by paying everyone the same percentage of need. Within the class of ADC recipients, percentage reduction, standing alone, does not discourage parents with large families from having more children or from keeping their younger children in the home. On the contrary, a ratable reduction, without the presence of per child maxima, encourages continuing parental care and protection of later-born children in large families by paying them the same benefits as the first child in a family. Therefore, we hold that the percentage reduction rule is entirely compatible with the federal statute and violates neither its express terms nor its purpose.

Next, plaintiffs allege that the per child maxima violate: (1) the basic purpose of 42 U.S.C. § 602(a)(10) for providing aid "with reasonable promptness to all eligible individuals", and (2) the basic purpose of the whole federal welfare program, which is to relieve need by giving equitable treatment, free from arbitrary restraints, to all needy persons.[25] Plaintiffs argue that it is arbi-

---

24. The same hint appears in Mr. Justice Douglas's dissent in *Dandridge*, 397 U.S. at p. 493, 90 S.Ct. at p. 1166, 25 L.Ed.2d at p. 507, in which he quotes approvingly the following statement from the HEW Amicus Curiae brief in *Rosado*:
"Maximums, whether so many dollars per individual or a total number of dollars per family, have an arbitrary aspect lacking from ratable reductions. * * * Where percentage reductions are used, the payment of every family is reduced proportionately. * * * This aspect explains why Congress might wish to distinguish between maximums and ratable reductions as a means of reducing a state's financial obligation and, at least inferentially, to disfavor the former." (See Also Westberry v. Fisher, 297 F.Supp. 1109 at 1116, Note 20 (D.C. Me., 3-judge, 1969)).

25. The other acts cited as evidence of this purpose are: 42 U.S.C. § 301 et seq. (Old Age Assistance) ; 42 U.S.C. § 1201 et seq. (Aid to the Blind) ; 42 U.S.C. § 1351 et seq. (APTD) ; 42 U.S.C. § 602(a) (10)—the state ADC plan must be uniformly applicable throughout the state; § 604(b) which forbids the application of a discriminatory "suitable home" rule.

trary and inequitable to give a second child only 60% of what a first child receives and a third child only 40%, particularly when economies of scale have already been deducted in determining need, as the parties have stipulated.

At the time this case was submitted several district courts had struck down per family maxima as violative of the federal statute and/or the Equal Protection Clause.[26] Then in *Dandridge* the Supreme Court overruled that reasoning and upheld family maxima. Defendants now argue that the rationale of *Dandridge* applies to per child maxima as well as per family, and is dispositive of the issue. Although Mr. Justice Douglas in dissent pointed out that the question of per child maxima was not before the court in *Dandridge* (397 U.S. 471, 90 S.Ct. 1153, 25 L.Ed.2d at p. 506), certain language of the majority opinion suggests that per child maxima are compatible with the federal statute as well as the Equal Protection Clause.

In response to the argument that maxima encourage large ADC families to farm out their youngest children to relatives in contravention of the basic purpose of the federal ADC statutes, the majority in *Dandridge* held that family maxima should not be considered as cutting off the youngest children completely, but as proportionately reducing the grant to the entire family. The *Dandridge* court stressed the concept of AFDC as aid to families rather than aid to individual children. As Mr. Justice Stewart stated for the majority:

" * * * Congress wished to help children through the family structure. * * * From its inception the Act has defined 'dependent child' in part by reference to the relatives with whom the child lives." (90 S.Ct. at p. 1158, 25 L.Ed. at p. 498).

* * * * * *

"So long as some aid is provided to all eligible families and all eligible children, the statute itself is not violated." (90 S.Ct. at p. 1159, 25 L.Ed. 2d at p. 499).

One reason the court chose to treat AFDC payments as going to the family as a whole was "the greater ability of large families—because of the inherent economies of scale—to accommodate their needs to diminished per capita payments." (*Dandridge*, 90 S.Ct. at p. 1159, 25 L.Ed.2d at p. 499). As stated earlier, Mississippi takes into account the inherent economies of scale in computing a family's budgetary deficit, so this reasoning would not necessarily control the present case.

The *Dandridge* court also relied on specific Congressional language in the "cost of living" amendment to the federal statute which stated that "any maximums" which the state imposes on the amount of aid must be adjusted to meet cost of living increases. 42 U.S.C. § 602 (a) (23). The majority found this language highly persuasive as to the compatibility of *all* maxima with the federal statute:

"This specific congressional recognition of the state maximum grant provisions is not, of course, an approval of any specific maximum. The structure of specific maximums Congress left to the States, and the validity of any such structure must meet constitutional tests. However, the 1967 amendment does make clear that Congress fully recognized that the *Act* permits maximum grant regulations." (Emphasis added). *Dandridge*, 90 S.Ct. at p. 1160, 25 L.Ed.2d at p. 500.

In view of this language, we conclude that the Supreme Court's decision in *Dandridge* requires us to hold that per child maxima are not repugnant to the federal welfare statutes.

---

26. Westberry v. Fisher, 297 F.Supp. 1109 (D.C.Me., 3-judge, 1969); Dews v. Henry, 297 F.Supp. 587 (D.C.Ariz., 3-judge, 1969); Williams v. Dandridge, 297 F. Supp. 450 (D.C.Md., 3-judge, 1969);

Lindsey v. Smith, 303 F.Supp. 1203 (D.C.Wash., 3-judge, 1969). A similar state court holding is Collins v. State Board of Social Welfare, 248 Iowa 369, 81 N.W.2d 4 (1957).

Plaintiffs' allegations of racial discrimination are sufficient to draw into question the compatibility of Mississippi's statute and administrative regulation with another federal statute which has not been specifically pleaded or otherwise relied upon by plaintiffs. We refer to the Welfare Civil Rights Statute, 42 U.S.C. § 2000d,[27] which forbids racial discrimination in any program providing federal financial assistance. We consider it proper to take this statute into full account, although not pleaded, because: (1) if a violation of § 2000d is shown by the proof, we need not reach the constitutional questions, and it is a favored policy of federal courts to decide cases on statutory grounds whenever possible; (2) no prejudice will result to defendants since the issues and proof under § 2000d are included in the issues and proof under the Equal Protection allegations; (3) 42 U.S.C. § 1983, the jurisdictional statute which plaintiffs have invoked tends to implicate other statutes designed to prevent racial discrimination; and (4) the court could, in its discretion, allow plaintiffs to amend their complaint to allege this statute even after trial so that the pleadings would fully conform to the proof. Rule 15, F.R.Civ.P. For the above reasons we consider it proper to discuss whether the Mississippi statute and regulations violate § 2000d.[28]

In considering alleged violations of § 2000d, courts have applied the same test they would apply if a violation of the Equal Protection Clause on racial grounds were alleged, i. e., the court will subject the challenged statute and regulations to the most rigid scrutiny, since such classifications bear a far heavier burden of justification than other classifications. *Jefferson*, supra; *Lampton*, supra.

We treat first plaintiffs' claim that the Mississippi percentage reduction rule, now applicable only to ADC and not to the "adult" categories, is in purpose and effect racially discriminatory, since 88% of ADC recipients are black and 12% white in contrast to the other categories which have far more white recipients: OAA 58% black and 42% white; AB 67% black and 33% white; and APTD 61% black and 39% white. While we agree that there is disparity in the percentages of recipients by race under the different programs, nevertheless the majority race under all programs is the Negro race. Upon very similar facts the 3-judge court in *Lampton* held that, racial considerations aside, treating ADC recipients differently from OAA, AB and APTD recipients was justified in view of the different purposes of the programs, i. e., ADC was to keep families together whereas the adult programs were to provide subsistence. The *Lampton* court also scrutinized the racial ratios of the programs, which were:

ADC — 80% black — 20% white
OAA — 48% black — 52% white.

The court found that since blacks were a majority or near-majority in each category, the application of a percentage reduction (10%) to ADC and not to OAA was not racially motivated. *Lampton*, supra, 299 F.Supp. at 344. As stated earlier, the Supreme Court vacated the *Lampton* order in a cryptic per curiam, 397 U.S. 663, 90 S.Ct. 1408, 25 L.Ed.2d 644, referring the 3-judge court to *Rosado*, supra, which was decided on the basis of violation of a federal statute and which did not reach the racial or constitutional issues presented there or in *Lampton*.

Shortly after *Lampton* was decided, a 3-judge district court in Texas held that the application of percentage reductions

---

27. "No person in the United States shall, on the ground of race, color, or national origin, be excluded from participation in, be denied the benefits of, or be subjected to discrimination under any program or activity receiving Federal financial assistance."

28. The statute is clearly in point and was relied upon by plaintiffs in the *Lampton* and *Jefferson* cases, supra.

(50%) to ADC recipients and not to the other categories was not racially or ethnically discriminatory against blacks or Mexican-Americans. Jefferson v. Hackney, supra, 304 F.Supp. 1332, at pp. 1338–1340. In Texas the ratios in 1969 were:

ADC   87%  black and Mexican-American
OAA   40%     "          "
AB     56%     "          "
APTD 47%     "          "

Recognizing these racial disparities, the court held that since the Texas legislature had consistently raised the ADC appropriations, and had submitted a constitutional amendment, which was to have been voted on in August 1969 to provide payment of 100% of need to all ADC recipients, these statistical differences revealed no racial discrimination in violation of either § 2000d or the Fourteenth Amendment.[29]

As shown above, blacks are in the majority in each Mississippi welfare category; they are also a clear majority (65%) of all welfare recipients in the State. There is, therefore, even less statistical basis for a finding of racial discrimination in Mississippi than there was in Louisiana or Texas, where blacks were in the majority in AFDC and in the minority in the other categories. Also, the record reveals that, in keeping with the different purposes of the separate programs, ADC recipients are treated as family units (cases) for purposes of distributing the limited welfare funds available, while adult recipients are treated individually. In September 1968,

the most recent month for which complete statistics are shown,[30] there were 25,365 ADC families and 84,557 ADC children. Considering ADC recipients as family units, there were 120,160 persons in the four welfare categories. Considering each ADC child as a separate recipient, there were 179,352 total recipients in all categories. Total funds paid in September 1968 for the four categories were $4,477,064. To determine the racial effect of treating ADC recipients by family rather than by child, we shall compare ADC, which was 88% black and 12% white, with OAA, the "whitest" category, which was 58% black and 42% white. By simple division it readily appears that if ADC recipients are treated as a family unit, they receive roughly the same percentage as the other recipients; treating each child as an individual recipient, however, ADC children fall far behind the other categories.[31]

Statistical summaries disclose that ADC *children* are 47% of all recipients and get only 20% of the funds; still treating ADC children individually, OAA recipients are 39% of the total and receive 57% of the money. On the other hand, treating ADC recipients by family, ADC *families* make up 21% of recipients and get 20% of all funds; OAA persons are 59% of recipients and get 57% of all funds.

It is thus clear that in spite of slight racial differences in the categories, the State's reason for treating ADC differently from the adult categories is not racially motivated, but is

---

29. We note that although the Supreme Court vacated the courts' orders in both *Lampton* and *Jefferson* on statutory grounds, the reasoning of those two courts on the question now before us, in which Judges Wisdom and Goldberg of the Fifth Circuit concurred, was not rejected by the Supreme Court's rulings.

30. Answer to Interrogatory 3.

31. Considered by *families*, ADC recipients were 25,365 of a total 120,160, or 21% of all recipients; they received $872,540, or 20% of a total $4,477,064; still

treating ADC recipients by family units, there were 70,929 OAA recipients, or 59% of a total 120,160, and they received $2,544,548, or 57% of the total funds.

Considering each ADC child as a separate recipient, ADC children made up 84,557, or 47% of a total 179,352 recipients, and received $872,540 or 20% of the total funds; still treating each ADC child as a separate recipient, the 70,929 OAA recipients were 39% of the total 179,352 and received 57% of the funds.

the result of different federal purposes of the separate assistance categories. ADC recipients, as families, are treated substantially the same as recipients in the adult categories in respect to a share of the public funds available. For the above reasons, we hold that plaintiffs have failed to prove that the Mississippi percentage reduction rule racially discriminates against blacks in violation of 42 U.S.C. § 2000d.

■ Plaintiffs also urge that the per child maxima discriminate against black ADC recipients within the ADC category since they most affect large families, and Mississippi blacks generally have larger families than whites. Although plaintiffs have offered no proof on this issue other than statistical reports of the Welfare Department, we analogize this case to voting rights, jury discrimination and school desegregation cases such as Gomillion v. Lightfoot, 364 U.S. 339, 81 S.Ct. 125, 5 L.Ed.2d 110 (1960), Whitus v. Georgia, 385 U.S. 545, 87 S.Ct. 643, 17 L.Ed.2d 599 (1967), and Green v. School Board of New Kent County, 391 U.S. 430, 88 S.Ct. 1689, 20 L.Ed.2d 716 (1968), in which statistical disparity alone was held to establish a prima facie case of racial discrimination. A review of Mississippi's ADC program at 5-year intervals since 1945 yields some rather surprising results.[32] Dividing the number of children into the number of families reveals that there is little difference in the size of black ADC families and white ADC families. In both 1945 and 1968 blacks had roughly 3.2 children per family and whites roughly 2.5 children per family. These figures are not suffi-

ciently different to establish a prima facie statistical disparity as a matter of fact. Plaintiffs having failed to make any factual showing that per child maxima operate more onerously on blacks than on whites within the ADC category, no further judicial scrutiny of the per child maxima under § 2000d is warranted.

## II. CONSTITUTIONAL CLAIMS

Turning now to the constitutional grounds, we first consider whether Mississippi's percentage reduction regulation violates the Equal Protection Clause on non-racial grounds by unjustifiably reducing ADC recipients to 30% of need while allowing recipients in the other categories 100% of need, not exceeding a $55 maximum.

■ We begin by reaffirming that Mississippi has considerable latitude in devising its ADC program:

"[T]here is no question that States have considerable latitude in allocating their AFDC resources, since each State is free to set its own standard of need and to determine the level of benefits by the amount of funds it devotes to the program." (King v. Smith, supra, 88 S.Ct. 2128 at 213, 20 L.Ed.2d 1118 at 1126).

The traditional equal protection standard in non-racial cases is whether there is a rational reason based on legitimate state interest for a classification which treats one group differently from another. The plaintiffs have the burden of showing that the State's classification does not rest upon any reasonable basis, but is essentially arbitrary. As Mr. Jus-

32.

| Year | Number of ADC Recipients | | | | Average Grant Per | | | |
| | Families | | Children | | Family | | Child | |
| | White | Black | White | Black | White | Black | White | Black |
| 1945 | 2557 | 460 | 6398 | 1463 | $25.53 | $30.02 | $10.20 | $ 9.44 |
| 1950 | Figures not available for 1950–54 | | | | | | | |
| 1955 | 4624 | 10841 | 17493 | 43205 | 23.79 | 26.43 | 6.29 | 6.63 |
| 1960 | 5040 | 14891 | 13588 | 47234 | 34.62 | 37.10 | 13.00 | 12.00 |
| 1965 | 3412 | 17043 | 9165 | 57240 | 33.33 | 37.89 | 12.41 | 11.28 |
| 1968 | 3019 | 22251 | 7984 | 76341 | 28.64 | 35.20 | 10.83 | 10.26 |

(Compiled from defendants' answer to Interrogatory 3)

tice Stewart defined the test in *Dandridge*:

"It is enough that the State's action be rationally based and free from invidious discrimination." *Dandridge*, supra, 90 S.Ct. at p. 1162, 25 L.Ed.2d at p. 503.

Several legitimate reasons exist for treating ADC differently from the adult categories and which provide a rational basis for applying percentage reductions to ADC only, as follows: [33]

1. The purpose of adult categories is to relieve need by giving subsistence income; that of ADC, as shown by federal legislation, is to keep families together. For this reason alone we would consider ADC to be a totally independent program, but there are also several other considerations suggesting the same conclusion;

2. Old, blind and disabled persons are more vulnerable and less likely to be able to provide for themselves in most cases than are dependent children, who often have at least one able-bodied parent to help care for them. These are questions for judgment of the state legislature, or its administrative agents. As the court in *Jefferson*, supra, 304 F.Supp. p. 1337, stated: "There remain priorities in time and functions in alleviating human misery.";

3. Each program is located in an entirely separate title of the Social Security Act and the Mississippi Code;

4. A state may adopt any, all or none of the programs and may drop any or all of them without regard to whether it adopts or drops the others;

5. 42 U.S.C. § 1381 et seq., authorizes a state to have a single plan combining the three adult categories, but does not include ADC;

6. States have the right to allocate different amounts of funds for the different categories; see King v. Smith, supra;

7. 42 U.S.C. § 603(d) placed a so-called "freeze" on ADC which did not apply to the adult programs.

■ These valid considerations have caused Congress and the courts to treat ADC as a category totally separate from the adult assistance categories. Therefore, we hold that plaintiffs have failed to show that ADC and the adult categories constitute a single program which would forbid the states from adopting, contrary to the Equal Protection Clause, a different method in dealing with ADC recipients.

Plaintiffs' point that percentage reduction is racially discriminatory in violation of the Equal Protection Clause has been fully treated in our analysis of 42 U.S.C. § 2000d and we do not repeat that discussion here.

■ We next consider plaintiffs' charge that per child maxima violate the Equal Protection Clause by invidiously discriminating between first-born and later-born children and also between small families and large families, not considering race. Whatever force this argument might have had before *Dandridge*, it must now fail as we are bound by the holding that maxima are not per se unconstitutional. Although Maryland's per family maxima are somewhat different in theory from Mississippi's per child maxima, the effect, in our opinion, is essentially the same, thus freeing Mississippi's statutory plan from constitutional infirmity. "It is enough that a solid foundation for the regulation [statute] can be found in the State's legitimate interest", (*Dandridge*, 90 S.Ct. at p. 1161, 25 L.Ed.2d p. 502) in apportioning its limited funds to achieve the differing goals of its diverse welfare programs. We are not called upon to decide whether Mississippi's system of statutory maxima is wise, or "that it best fulfills the relevant social and economic objectives that * * * [Mississippi] * * * might ideally espouse, or that a more just and humane system could not be

33. *Jefferson*, supra, 301 F.Supp. pp. 1336–1338; *Lampton*, supra, 299 F.Supp. pp. 338–342.

devised." *Dandridge,* 90 S.Ct. at p. 1162, 25 L.Ed.2d p. 503.

Plaintiffs' final contention, that per child maxima are racially discriminatory as applied in Mississippi, was fully dealt with in considering whether they violated the federal statute. In this respect *Dandridge* is not authoritative since the majority opinion carefully pointed out that no claim was made that Maryland's regulation "is infected with a racially discriminatory purpose or effect such as to make it inherently suspect", (90 S.Ct. at page 1162, 25 L.Ed.2d at page 502, Fn. 17). We simply reiterate that the evidence fails to show that black ADC families are affected any differently by the maxima than are white ADC families, or that the progressively more restrictive maxima burden Negro families more than white families. The statutory plan adopted by Mississippi for ADC welfare should not be invalidated merely because there is a greater percentage of Negro recipients under that program than under the other categories, where it has been affirmatively shown that Mississippi, like many other states, has imposed statutory maxima on a basis of rational justification unrelated to race.

We, therefore, conclude that plaintiffs are not entitled to the relief requested, and their complaint should be dismissed.