**Robert D. JUNGHANS, Petitioner,**

v.

**DEPARTMENT OF HUMAN RESOURCES of the District of Columbia, Respondent.**

**No. 5628.**

District of Columbia Court of Appeals.

Argued Sept. 22, 1971.

Decided March 15, 1972.

The applicable section now is D.C.Code 1967, § 16–3711, which contains the same language.

Edward E. Schwab, Washington, D. C., for petitioner.

David P. Sutton, Asst. Corporation Counsel, with whom C. Francis Murphy, Corporation Counsel, and Richard W. Barton, Asst. Corporation Counsel, were on the brief, for respondent.

Before KERN, NEBEKER and REILLY, Associate Judges.

KERN, Associate Judge.

Petitioner is disabled and receives a monthly public assistance payment which respondent decided, after an intra-agency hearing and appeal, to reduce. This is a petition for review of respondent's action upon both procedural and substantive grounds. D.C.Code 1967, § 1–1510 (Supp. IV, 1971). In order properly to assess the alleged procedural irregularities and to comprehend the substantive issue it is necessary to describe briefly the applicable statutes and relevant decisional precedent before turning to the specific facts of this case.

Congress as a part of its legislative responsibility for this jurisdiction enacted the District of Columbia Public Assistance Act of 1962, D.C.Code 1967, § 3–201 et seq., establishing five categories of public assistance:

(1) Old Age Assistance;

(2) Aid to the Blind;

(3) Aid to the Disabled;

(4) Aid to Dependent Children;

(5) General Public Assistance. (D.C. Code 1967, § 3–202(a)).

Congress provided that the Public Assistance Act be "administered by the Commissioners who shall . . . establish and enforce such rules and regulations as may be necessary and desirable to carry out the provisions" of the Act. D.C.Code 1967, § 3–202(b) (2). The Act further provides that "[t]he amount of public assistance which any person shall receive shall be determined in accordance with regulations approved by the Commissioners." D.C.Code 1967, § 3–204(a).

Reorganization Plan No. 3 of 1967 transferred from the former Commissioners to the present District of Columbia Council the function of "[e]stablishing rules and regulations to carry out" the Public Assistance Act and of "approving regulations in accordance with which shall be determined the amount of public assistance which any person shall receive." D.C.Code 1967, Appendix to Title I, §§ 402(83), (84) (Supp. IV, 1971).

The Social Security Act of 1935 makes federal funds available to the states, including the District of Columbia, 42 U.S.C. § 1301(a) (1) (1970), for use in their public assistance programs so long as these programs meet certain requirements enumerated in that Act. 42 U.S.C. § 301 et seq. (1970), particularly §§ 302, 602, 1202, and 1352.

In 1967, Congress amended the Social Security Act to *require* all states to update by July 1, 1969, the standards for assistance [1] to recipients of Aid to Families with Dependent Children (AFDC) to reflect the cost of living then current. 42 U.S.C. § 602(a) (23) (1970). *See also* 45 C.F.R. § 233.20(a) (2) (ii) (1970). Although federal law does not require the *same* assistance standard for *each* category of public assistance, Jackson v. Department of Public Welfare, 317 F.Supp. 1151, 1155 (M.D.Fla.1970); Jefferson v. Hackney, 304 F.Supp. 1332, 1336–1337 (N.D.Tex.1969), vacated and remanded, 397 U.S. 821, 90 S.Ct. 1517, 25 L.Ed.2d 807 (1970), the District of Columbia and many states updated their assistance standards for *all* categories of public assistance.[2] In brief, recipients of Aid to the Disabled, such as petitioner, were affected by the Congressional legislation directing the states and the District to update their AFDC welfare programs to reflect changes in the cost of living.

The new standards for public assistance which the states and the District of Columbia adopted in response to the command from Congress were necessarily more costly because of the increased cost of living. They sought to maintain budgetary stability (or even decrease the size of their public assistance expenditures),[3] by creating welfare payment formulas which paid to each public assistance recipient only a *percentage* of the standard for assistance, *i. e.,* the public assistance recipient's monthly minimum subsistence needs. Thus, for example, prior to August 1970, the District paid all categories of public assistance only 85% of the standard for assistance it had fixed to meet their minimum subsistence needs.[4]

The Supreme Court has recognized that the states are given wide latitude in setting standards for public assistance and in establishing the level of benefits to be paid, Rosado v. Wyman, 397 U.S. 397, 408, 90 S.Ct. 1207, 25 L.Ed.2d 442 (1970), and that the amendments to the Social Security Act in 1967 do not prohibit states from paring down the amount of benefits paid "to accommodate budgetary realities," 397 U.S. at 413, 90 S.Ct. 1207. But the District of Columbia and some 15 other states have taken yet *another* step to reduce the cost of their public assistance programs: They have adopted the practice of subtracting whatever resources a public assistance recipient has (*e. g.,* wages, pensions, etc.) from that *percentage of his need they have determined to pay* (75%, for example), rather than from his *full* monthly minimum subsistence they have determined he needs. He is then paid the difference.

---

1. The standard for assistance may be defined as the sum total of the monthly *minimum subsistence* requirements of each public assistance unit (composed of the recipient and his dependents) for (a) food, (b) clothing, (c) shelter, and (d) personal needs—as determined by the particular State or the District of Columbia.

2. The provisions of the Social Security Act of 1935 relating to the various categories of public assistance are: 42 U.S.C. § 301 et seq. (1970) [Old Age Assistance]; 42 U.S.C. § 601 et seq. (1970) [Aid to Families with Dependent Children]; 42

U.S.C. § 1201 et seq. (1970) [Aid to the Blind]; and, 42 U.S.C. § 1351 et seq. (1970) [Aid for the Permanently and Totally Disabled].

3. *See* Rosado v. Wyman, 397 U.S. 397, 407, 90 S.Ct. 1207, 25 L.Ed.2d 442 (1970).

4. Respondent apparently used this welfare payment formula (based upon the 1967 cost of living) under the authority granted to it by Reg. No. 69–57 (eff. Jan. 1, 1970). (Supp. Memo. of Respondent at 3 and Exhibit "D").

In the instant case, the District determined that under the February 1970 cost of living the monthly minimum subsistence need of petitioner's "assistance unit" (composed of his wife and himself) was $206. Petitioner's resources (consisting of wages and a pension) were found to be $97.45. Respondent, in determining the amount of petitioner's monthly public assistance payment, off-set his resources of $97.45 against 75% of his need (i. e., $154.52) rather than his *entire* monthly minimum subsistence need of $206.[5]

Other states have rejected this approach and adopted different welfare payment formulas:

(a) Payment of 100% of the budgetary deficit [the difference between a recipient's monthly resources and the full monthly standard of need for his assistance unit as determined by the state], *see* Lampton v. Bonin, 304 F.Supp. 1384, 1385 n.2 (E.D.La. 1969), vacated and remanded, 397 U.S. 663, 90 S.Ct. 1408, 25 L.Ed.2d 644 (1970); Rosado v. Wyman, *supra,* 397 U.S. at 409, 90 S.Ct. 1207, or,

(b) payment of a certain percentage of the budgetary deficit, *see* Ward v. Winstead, 314 F.Supp. 1225, 1229–1230 (N.D.Miss.1970).

In the Texas AFDC program, the effect of this practice—identical to that employed in the District—led to increased benefits for 14,000 Texas families, decreased benefits for 22,812 families, and totally eliminated 2,470 families from the AFDC rolls, Jefferson v. Hackney, *supra,* 304 F.Supp. at 1343. The record in the instant case does not indicate the effect which the use of this type of formula has had upon the size of the welfare rolls or the amount of the payments to the various categories of public assistance recipients in the District.

Whether a state can utilize a welfare percentage formula in such a way is presently before the Supreme Court on the merits in the context of the Texas AFDC program. Jefferson v. Hackney, 404 U.S. 820, 92 S.Ct. 115, 30 L.Ed.2d 47 (1970). It is pointed out that a public assistance recipient whose monthly resources may equal a particular percentage of his total monthly needs but nevertheless fall short of meeting his *total* need is *excluded altogether from any public assistance whatsoever.* It is further pointed out that the applicable

5. An example involving a hypothetical recipient illustrates that this type of payment formula could conserve all of the state's budget resources for the most needy while significantly reducing or eliminating altogether public assistance for the needy who receive some income from wages or pensions:

| Monthly Figures | for 1966 | for 1970 | |
| --- | --- | --- | --- |
| Resources (i.e., wages & pension) | $100 | $150 | |
| Minimum Subsistence Needs | 150 | 200 | (updated to reflect cost of living) |
| Budgetary Deficit (the difference between needs and resources) | 50 | 50 | |
| Assistance Payment | 50 | 0 | (under 75% formula) |

Prior to the 1967 Congressional amendments to the Social Security Act, the hypothetical recipient would have received $50 in public assistance because the applicable formula paid him his full need (measured by the budgetary deficit). Following the update of the standard of need required by Congress in 1970 to $200, his new budgetary deficit was still $50 despite an *assumed* 50% increase in his wages during this period and an *assumed* 33% increase in the cost of living. Because the District formula first takes 75% of his new needs (75% of $200=$150) and then subtracts his monthly resources, his assistance payment now would be $0. Thus, this hypothetical recipient, despite higher resources compared with a somewhat less increased need, is relatively worse off in 1970 than he was in 1966. If the District subtracted his resources from his *entire* new needs ($200–$150) and then paid 75% of this budgetary deficit, he would receive $37.50.

federal and local welfare statutes provide that assistance shall be furnished "with all reasonable promptness to *all* eligible individuals," (emphasis added), 42 U.S.C. § 602(a) (10) (1970); D.C.Code 1967, §§ 3–207(a), 3–203.[6]

We do not reach petitioner's challenge to respondent's practice because we dispose of this case upon procedural grounds. The substantive legal issue does, however, serve to point up how important are the decisions by the Council and the Commissioner to fix a welfare payment formula and to establish a public assistance standard of need. When called upon to review their actions we are mindful, too, that the Supreme Court has ascribed to the Congress an intention to require each state, including the District, "to face up realistically to the magnitude of the public assistance requirement and lay bare the extent to which their programs fall short of fulfilling actual need," and to "paying the political consequences" of such disclosure, Rosado v. Wyman, *supra,* 397 U.S. at 412–413, 421, 90 S.Ct. at 1218. We note also the proposition that administrative agencies have the responsibility of fully informing themselves of the public's viewpoint before making difficult and fundamental policy determinations concerning the allocation of scarce resources, Pharmaceutical Manufacturers Association v. Finch, 307 F.Supp. 858, 865–866 (Del.1970).

Given the consequences for the residents of the District that flow from the decision by the Council and the Commissioner to enact one of the several possible formulas for the payment of welfare assistance, the procedural steps taken by the Council and the Commissioner in this case require careful scrutiny to determine whether they pass muster under the applicable statutes and rules.

On June 22, 1970, the District of Columbia Register (16 D.C.Reg. 518 (1970)), contained the following *Notice:*

The Mayor-Commissioner hereby gives notice that the following has been submitted to the District of Columbia Council for their consideration with the necessary expediency needed to comply with the Department of Health, Education and Welfare's Regulation 20–7 which specifies that States' standards for assistance to Families with Dependent Children should be adjusted to reflect fully changes in the cost of living standards that have occurred since such standards were established.

The Mayor-Commissioner proposes to amend City Council regulation No. 69–57 to provide for new budget standards as shown in the two attached tables.

Table I indicates payments that would be made to recipients if 100 per cent of February, 1970 cost of living standards were applied.

Table II indicates the payments that the District is prepared to make under present budgetary constraints.[7]

On July 7, 1970, the Council met and, after dispensing with a second reading and second vote, enacted Regulation No. 70–36,

6. *Cf.* Dandridge v. Williams, 397 U.S. 471, 481, 90 S.Ct. 1153, 25 L.Ed.2d 491 (1970), rehearing denied, 398 U.S. 914, 90 S.Ct. 1684, 26 L.Ed.2d 80 (1970), where the Supreme Court approved of Maryland's statutory maximum on the assistance payment to AFDC recipients under 42 U.S.C. § 602(a) (10) (1970), "[s]o long as *some* aid is provided to *all* eligible families and all eligible children." (Emphasis added.) *See also* Townsend v. Swank, 404 U.S. 283, 92 S.Ct. 502, 30 L.Ed.2d 448 (1971) sl. op. at 3–5. Other courts have criticized the type of formula

utilized in the District because some needy individuals are totally "cut off" from any assistance, Ward v. Winstead, 314 F.Supp. 1225, 1233 (N.D.Miss.1970); Villa v. Hall, 98 Cal.Rptr. 460, 490 P.2d 1148 (Cal.Sup.Ct.1971).

7. Two tables were attached which set forth (for all categories of assistance) the amount of the grant which would be paid to each assistance unit based upon costs for food, clothing, personal and household needs, and the number of persons in the assistance unit, 16 D.C.Reg. 519–20.

which directed respondent (a) to determine the needs of public assistance recipients upon the basis of the cost of living in February 1970, and (b) "to compute public assistance grants at a percentage of the cost of living of February 1970, commensurate with available funds." On the same day, the Commissioner issued Order No. 70–265, directing respondent "to set the level of public assistance payments at 75% of the public assistance standards."

On July 27, 1970, the D.C. Register contained notice that the Council had enacted the Regulation, that it had been approved by the Commissioner and that such regulation would go into effect on August 1st. The Commissioner's Order *was never* published in the D.C. Register.

On August 17, 1970, respondent notified petitioner that his public assistance payment would be reduced. We are of opinion that respondent's decision cannot stand because it is based upon an Order which is invalid under the District of Columbia Administrative Procedure Act (D.C. APA).

■ Commissioner's Order No. 70–265, whether we consider it an *implementing* directive, as Corporation Counsel characterizes it, or *prescribing* policy, is a "rule" as defined by the D.C. APA.[8] Congress has directed in Section 7(c) of the APA that "each rule adopted . . . by the Commissioner . . . shall [not] become effective until after its publication in the D.C. Register." D.C.Code 1967, § 1–1506(c) (Supp. IV, 1971). Since Commissioner's Order No. 70–265 was never published in the D.C. Register, as Congress has mandated, it never became effective.

■ Congress has further provided in the D.C. APA that before adopting any rule or amendment thereof the Commissioner "shall . . . publish . . . notice of the intended action so as to afford interested persons opportunity to submit data and views either orally or in writing, as may be specified in such notice," D.C. Code 1967, § 1–1505(a) (Supp. IV, 1971). The Notice of June 22nd did not meet the statutory requirement for two reasons.

■ First, the Notice did not state where and in what way, orally or in writing, interested persons were to submit their views.[9] In contrast, information as to where and how submissions from the public should be made can be found in other notice announcements in the D.C. Register, *e. g.*, 16 D.C. Register 406, 435. We do not find that interested persons are afforded an opportunity to comment on proposed rules if the general public does not know where or how to submit the comments.

Second, the Commissioner issued his Order on July 7th—only 15 days after the Notice, although Section 6(a) of the APA (D.C.Code 1967, § 1–1505(a) (Supp. IV, 1971) requires 30 days between notice and adoption, unless "good cause" for more expeditious action is "found and published with the notice." Corporation Counsel contends that this section of the APA was not violated because the Commissioner's Order would not become effective until August 1, 1970 (the effective date of Council Regulation 70–36), which was 39 days *after* the June 22nd Notice.

■ It is true that Sections 1–1505(a) and 1–1506(c) and the available legislative

---

8. Section 3(6) provides in pertinent part: The term "rule" means the whole or any part of any Commissioner's . . . statement of general or particular applicability and future effect designed to *implement*, interpret, or *prescribe* law or policy . . . (Emphasis added.) (D.C.Code 1967, § 1–1502(6) (Supp. IV, 1971).

9. We interpret the words "as may be specified in such notice" contained in D.C.Code 1967, § 1–1505(a) (Supp. IV, 1971) to allow the administrative agency to choose whether oral *or* written views should be submitted by interested persons, but *not* to omit entirely any reference to the appropriate means by which "interested persons" are to communicate their views.

history of the D.C. APA [10] do allow rule-makers to announce rules which may become *effective* 30 days after the public has had notice. However, we construe the *full* requirements of Section 1–1505(a), as dictated by Congress, to be that the notice must afford interested persons an opportunity to be heard on the proposed rule. In order to be afforded that opportunity, the general public must be advised of the current status of the proposed rule as it stands before the rulemaker. We believe that Congress intended the *notice* of a proposed rule to inform the public that the rulemaker (a) would either wait 30 days before taking *final* action on the pending proposal,[11] or (b) was contemplating taking final action in less than 30 days.

Our construction of the statute is in keeping with the statement concerning notice of proposed rulemaking made by F. E. Cooper, a leading commentator on the subject of the Model State Administrative Procedure Act upon which the D.C. APA is based:

> This legislative trend [to give notice and afford interested persons an opportunity to be heard] reflects a deep-seated conviction that as a matter of sound governmental policy, parties to be affected by administrative action should have a full opportunity to present their views before *any official action* is taken. (Emphasis added.)[12]

1 F. Cooper, State Administrative Law, 135 (1965). *See generally,* Couch v. Zoning Commission, 141 Conn. 349, 357, 106 A.2d 173, 177 (1954); Pecora v. Zoning Commission, 145 Conn. 435, 444, 144 A.2d 48, 53 (1958).

In the instant case, the June 22nd Notice specified only that a welfare payment proposal was being considered, without indicating in any way that the Commissioner would take his final action on the proposal in less than 30 days. In view of our interpretation of Section 1–1505(a), the June 22nd Notice did not provide adequate information so as to afford interested persons opportunity to submit their views on the proposal before it was adopted.

■ Corporation Counsel's alternative position is that there was good cause found and published with the Notice, so that the Commissioner could have issued the Order without waiting for the expiration of 30 days. Such "good cause," he urges, is the reference in the Notice to "the necessary expediency needed to comply witth the Department of Health, Education, and Welfare's Regulation 20–7," but reference to this unexplained Regulation is meaningless. The June 22nd Notice did not state any *reasons* for the "necessary expediency" of the proposed administrative action. *Compare,* Dighton v. Coffman, 178 F.Supp. 114, 117 (E.D.Ill.1959), modified, 179 F.Supp. 682, affirmed, 279 F.2d 497 (7th Cir. 1960). Without a statement in the Notice of *reasons* for expedient action, the general public affected by the Commissioner's action would never be able to obtain judicial review concerning the justification of the "good cause" allegedly found by the administrative agency to reduce the notice to less than 30 days. *See generally*, Little v. Sullivan, 173 So.2d 135, 136–137 (Fla.1965); Bidwell v. McSorley, 194 Va. 135, 72 S.E.2d 245 (1952); Pines v. District Court, 233

10. "Except in emergency situations . . . prior to the adoption, amendment, or repeal of any rule, notice of the proposed action must be published . . . at least 30 days prior to the *effective* date of the new rule, change, or repeal." S.Rep. No. 1581, 90th Cong., 2d Sess. (1968). (Emphasis added.)

11. Interestingly enough, we note that the City Council has adopted a rule of procedure, that requires it to wait for 30 days after notice before *enacting* any regulation, unless there is good cause found

and published for more expeditious action. 2 D.C.R.R. 2.6(a).

12. The fact that D.C.Code 1967, § 1–1505 (b) (Supp. IV, 1971), allows any interested person the right to petition an administrative agency for the promulgation, amendment, or repeal of any rule which has already become effective is *not* to be viewed as a substitute for the genuine opportunity to comment on a proposed rule before the agency takes its final action on the proposal.

Iowa 1284, 1302, 10 N.W.2d 574, 583 (1943). In the instant case, the Notice's reference to HEW Regulation 20–7, without identifying where that Regulation could be found and read and without explaining that Regulation's relevance to the *District's need for expediency*, did not constitute "good cause found and published" for action by a rulemaker upon less than 30 days notice.

In sum, we hold that Commissioner's Order No. 70–265 was a "rule" within the meaning of D.C.Code 1967, § 1–1502(6) (Supp. IV, 1971) and that it never became effective because it was never published as required by D.C.Code 1967, §§ 1–1506, 1–1507 (Supp. IV, 1971). We also hold that the notice of this proposed rule was inadequate under D.C.Code 1967, § 1–1505(a) (Supp. IV, 1971) because it failed to specify where and how interested persons were to submit their comments, did not indicate that the Commissioner intended to take final action on the proposed rule in less than 30 days, and failed to supply adequate reasons to constitute good cause for the issuance of the rule upon less than 30 days notice. The procedures followed in this case by the Commissioner although undoubtedly in good faith, denied "interested persons" among the general public both the opportunity to comment upon the proposed rule before its issuance, and the right to request repeal or modification of the rule after issuance.

■ Corporation Counsel, in defending respondent's decision to reduce petitioner's public assistance payment, relies primarily upon the Council's Regulation No. 70–36. However, the Commissioner's Order, not the Council's Regulation, fixes the public assistance payment formula for the District of Columbia and we hold that the invalidity of the Commissioner's Order necessarily invalidates respondent's decision here under review. Although it is not necessary to the decision of this case, we admit to a grave doubt that the Council carried out fully its function as intended by Congress under Reorganization Plan No. 3 "to approve regulations pursuant to which amounts of public assistance shall be determined." In this case, the Commissioner, not the Council, issued Order 70–265 which approved 75% as the percentage of need which the District would pay its public assistance recipients. While the Council under the Reorganization Plan may delegate to the Commissioner any of its functions, D.C.Code 1967, Appendix to Title I, § 205 (a) (Supp. IV, 1971), we have been referred to no such delegation. In connection with the proper division of functions between Commissioner and Council we also note that the only notice in this case was issued by the Commissioner although the Council's own procedural rules, see note 11, *infra*, place responsibility for publishing notice prior to any Council action on the *Council's* own Secretary. 2 D.C.R.R. 2.6(a).

In addition, there is serious question whether the Council in enacting the Regulation complied with its own rules of procedure.[13] Specifically, the Council's rules require two readings and two votes to be taken before a proposed regulation can become effective unless it is determined an emergency, in which case the regulation adopted expires at the end of 120 days. D.C.R.R. 6.1(b) (c), 2 D.C.R.R. 2.6(b). In this case, although Regulation No. 70–36 was characterized as an emergency by the Council according to its Minutes, and was enacted after only one reading and upon but one vote, that Regulation purports to be in force today, long after the expiration of 120 days.

The Council's rules state that public hearings are scheduled "for matters of broad

---

13. Section 4 of the D.C. APA (D.C.Code 1967 § 1–1503 (Supp. IV, 1971) requires the Council to "establish procedures," including rules of practice before it. Failure of a governmental body to conform to its own procedural rules may render its action invalid. Service v. Dulles, 354 U.S. 363, 77 S.Ct. 1152, 1 L.Ed.2d 1403 (1957) ; Shaughnessy v. United States, 349 U.S. 280, 75 S.Ct. 746, 99 L.Ed. 1074 (1955). *See also* Bridges v. Wixon, 326 U.S. 135, 65 S.Ct. 1143, 89 L.Ed. 2103 (1945).

community concern," 2 D.C.R.R. (ii) (Introduction), yet no public hearing was scheduled by the Council before enacting Regulation No. 70–36 which affected the 100,000 public assistance recipients in the District of Columbia.

■ Finally, we turn to respondent's decision to subtract the resources of a public assistance recipient from 75% rather than 100% of his monthly minimum subsistence need, as established under the February 1970 cost of living. Such decision was not authorized or approved by the Council's Regulation No. 70–36 or the Commissioner's Order No. 70–265.[14] The effect of respondent's action may be to bar altogether from *any* public assistance persons in this city whom respondent has in the past determined *to be needy.* While we need not decide in this case whether this practice is permissible under the Social Security Act and the D.C. Public Assistance Act of 1962, we do conclude that it constituted "rulemaking" within the meaning of the D.C. APA. Section 6(a) of that Act requires the Commissioner's "designated agent," which respondent was in this case, to give public notice before adopting any rule, D.C.Code 1967, § 1–1505(a) (Supp. IV, 1971), and he did not do so.

We must now determine the proper disposition of this petition for review. Congress has vested us with latitude in disposing of petitions for review of administrative orders and decisions.[15] In the instant case it is clear to us from the record that when the Commissioner issued Order No. 70–265 and the Council enacted Regulation No. 70–36 on July 7, 1970, they were attempting, commendably but belatedly,[16] to put the District's public assistance program in compliance with the Social Security Act and thereby avoid losing federal funds for such program.[17] Therefore, if requested, we would be favorably disposed to grant a further stay of the mandate issuing upon this opinion (beyond the automatic stay of 21 days provided by our Rule 41(a)) in order to give the Council and Commissioner opportunity to issue, after proper notice and upon appropriate publication, rules establishing a public assistance payment formula for the District of Columbia relating back to August 1, 1970.

The new rule might of course contain the "75% formula," which we have concluded today is invalid for lack of proper notice and publication, or may contain a particular formula for the period from August 1, 1970, through the present, and a different formula for the future.[18] We

---

14. The Department of Health, Education and Welfare has approved this type of formula, which is now before the Supreme Court, because it concentrates funds "in a manner which assures a greater proportion to those least able to care for themselves." Amicus Curiae Brief of the United States submitted in Jefferson v. Hackney, 404 U.S. 820, 92 S.Ct. 115, 30 L.Ed.2d 47 (1970). However, the Minutes of the Council on July 7, 1970, reflect a representation to the Council that enactment of Regulation 70–36 "will *not in any way* change the dollar amount of present payments to recipients." (Exhibit "B", respondent's supplemental memorandum).

15. D.C.Code 1967, § 1–1510 (Supp. IV, 1971) provides in pertinent part:
    [T]he court shall have . . . power to affirm, modify, or set aside the order or decision complained of, in whole or in part, and, if need be, to remand the

case for further proceedings, *as justice may require.* . . . (Emphasis added.)

16. Congress had directed the states and the District to revise standards for public assistance by July 1, 1969. The Commissioner and the Council apparently delayed until they could ascertain the District's precise appropriation available for that fiscal year.

17. HEW had threatened the District with a "non-conformance" hearing unless its standards for public assistance were amended to reflect the July 1969 cost of living.

18. As we have stated heretofore in our opinion, *supra* 6–7, we do not reach the substantive issue whether respondent's practice under Order No. 70–265 of off-setting resources of a public assistance recipient against a percentage of what he needs for minimum subsistence is valid.

take it as established by 42 U.S.C. § 602(a)(23) (1970), that the Commissioner and Council cannot fall back to the "85% formula," which was in force prior to August 1, 1970, and was based upon the *1967* cost of living, and still remain eligible, at least as to its AFDC public assistance program, to receive federal funds. In any event, that is a matter between respondent and federal authorities and is not before us for decision.

The decision of the Director of the Social Services Administration to reduce petitioner's public assistance payments is reversed and this cause is remanded for further proceedings consistent with this opinion.

Reversed and remanded.

We note that the Supreme Court has heard argument in Jefferson v. Hackney, 404 U.S. 820, 92 S.Ct. 115, 30 L.Ed.2d 47 (1970), which contains, among others, this issue.