Donald J. HAMER, As Personal
Representative of Cora J.
Duvall, Petitioner,

v.

DEPARTMENT OF HUMAN SERVICES,
GOVERNMENT OF the DISTRICT
OF COLUMBIA, Respondent.

No. 84–16.

District of Columbia Court of Appeals.

Argued Jan. 9, 1985.

Decided May 16, 1985.

Louis P. Robbins, Washington, D.C., with whom Todd S. Deckelbaum and Martin J. Gaynes, Washington, D.C., were on the briefs, for petitioner.

Edward E. Schwab, Asst. Corp. Counsel, Washington, D.C., with whom Inez Smith Reid, Corp. Counsel, John H. Suda, Principal Deputy Corp. Counsel, and Charles L. Reischel, Deputy Corp. Counsel, Washington, D.C., were on the brief, for respondent.

Before PRYOR, Chief Judge, and BELSON and TERRY, Associate Judges.

BELSON, Associate Judge:

Petitioner, the personal representative of decedent Cora Duvall, appeals the District of Columbia Department of Human Services' (DHS) determination that decedent was ineligible for Medical Assistance (Medicaid) benefits. Petitioner does not dispute the fact of decedent's ownership of resources in excess of Medicaid guidelines. Petitioner contends, however, that these guidelines are invalid because DHS omitted, on federal command, the provision allowing "spend-down" of resources, without complying with the rulemaking procedures of the District of Columbia Administrative Procedure Act (D.C.A.P.A.). We hold that the rulemaking procedures of the D.C.A.P.A. are inapplicable to this federally compelled change in computing Medicaid eligibility, and affirm.

Cora Duvall was admitted to the Capitol Hill Hospital on June 2, 1982, and remained a patient there until her death on September 20, 1982. A court-appointed conservator, on August 31, 1982, submitted an application for Medicaid benefits on Ms. Duvall's behalf. DHS denied the application because Ms. Duvall maintained a combined balance of $12,458.25 in a checking and savings account. These resources were in excess of the allowable cash reserve limit of $2,500. Ms. Duvall had, however, incurred at least $59,000 in hospital bills by the date of the Medicaid application, and the outstanding hospital bill at the time of her death amounted to $105,403.29. The hospital filed a lien against Ms. Duvall's estate for that amount. Ms. Duvall's personal representative appealed the initial finding of ineligibility. After a hearing, DHS affirmed that determination. Ms. Duvall's personal representative appeals from that decision.

At issue is the validity of a revision to the District of Columbia State Plan for Medicaid. A brief review of this complex program should serve to focus the issue here. The United States Department of Health and Human Services (HHS) provides matching funds pursuant to Title XIX of the Social Security Act (Act) to states and the District of Columbia to administer Medicaid programs. 42 U.S.C. § 1396 *et seq.* (1982); 42 C.F.R. § 430.0 *et seq.*[1] Disbursements of such funds to a particular state is conditioned on its submission of a state plan for approval by HHS. 42 U.S.C.

---

1. The District of Columbia is defined as a "State" for the purposes of the Social Security Act. 42 U.S.C. § 1301(a)(1).

§§ 1396, 1396a; 45 C.F.R. § 201.0 *et seq.* (1984). The state plan must meet the requirements imposed both by the Act and by the Secretary of HHS. *Schweiker v. Gray Panthers,* 453 U.S. 34, 37, 101 S.Ct. 2633, 2636, 69 L.Ed.2d 460 (1981) (citing 42 U.S.C. § 1396a). Furthermore, a state plan must be "amended whenever necessary to reflect new or revised Federal statutes or regulations." 45 C.F.R. § 205.5.

States participating in the Medicaid program must provide coverage for certain individuals, such as those receiving aid to families with dependent children. 42 C.F.R. § 435.100 *et seq.* Such individuals are termed the "categorically needy." *Id.; see also Harris v. McRae,* 448 U.S. 297, 301, 100 S.Ct. 2671, 2680, 65 L.Ed.2d 784 (1980) (although participation in Medicaid program is optional, once a state participates it must comply with Title XIX requirements, including coverage for the categorically needy). States have the option of providing benefits to other individuals, called the "medically needy," provided those individuals meet reasonable state plan income and resource criteria. 42 C.F.R. §§ 435.300–.340. DHS has opted to provide coverage for the medically needy.

The Act requires state plans to include reasonable eligibility standards that take "into account only such income and resources as are, *as determined in accordance with standards prescribed by the Secretary,* available to the applicant or recipient." 42 U.S.C. § 1396a(a)(17)(B) (emphasis added); *see also Herweg v. Ray,* 455 U.S. 265, 274–75, 277, 102 S.Ct. 1059, 1066, 1067, 71 L.Ed.2d 137 (1982) (Congress has delegated broad authority to HHS to set eligibility standards for state Medicaid plans). The Act also provides for what is commonly termed a "spend-down" provision for the determination of income eligibility. State plans must:

> provide for flexibility in the application of such [eligibility] standards with respect to *income* by taking into account, except to the extent prescribed by the Secretary, the costs (whether in the form of insurance premiums or otherwise) incurred for medical care or for any other type of remedial care recognized under State law . . . .

42 U.S.C. § 1396a(a)(17) (emphasis added). The HHS regulation for medically needy income eligibility implements this statutory command for income standard flexibility. 42 C.F.R. § 435.831. This regulation requires the state agency to deduct from income such incurred medical expenses that are not subject to payment by a third party. 42 C.F.R. § 435.831(c). After such deductions, an individual will meet the income eligibility standard if the incurred medical expenses reduce the income to the permissible level. 42 C.F.R. § 435.831(d).

Until August 1980, HHS permitted state plans to allow the "spend down" of incurred medical expenses not only for determining *income* eligibility, as just described, but also for determining *resource* eligibility.[2] If petitioner's Medicaid application had been filed prior to August 1980, she presumably would have met the Medicaid resource standard because her incurred medical expenses on the date of application far exceeded her resources.[3]

---

**2.** The term "resources" is defined as:

> [C]ash or other liquid assets or any real or personal property that an individual (or spouse, if any) owns and could convert to cash to be used for his support and maintenance. If the individual has the right, authority or power to liquidate the property, or his share of the property, it is considered a resource. If a property right cannot be liquidated, the property will not be considered a resource of the individual (or spouse). . . . Liquid resources are those assets that are in cash or are financial instruments which are convertible to cash. Liquid resources include cash on hand, cash in savings accounts or checking accounts, stocks, bonds, mutual fund shares, promissory notes, mortgages, and similar properties. Liquid resources, other than cash, are evaluated according to their equity value.

20 C.F.R. § 416.1201 (1984).

**3.** Medically needy applicants were permitted a cash reserve, so that incurred medical expenses under a spend-down system need only have been greater than the balance of resources above the reserve. For example, petitioner

In August 1980, HHS sent a Medicaid transmittal letter to DHS that instructed DHS to revise its state plan eligibility resource requirements for the medically needy. The required revision eliminated the provision for a "spend-down" of incurred medical expenses for determining an individuals' *resource* eligibility, although such a provision remained for determining an individual's *income* eligibility. The HHS transmittal stated:

> The current [Medicaid preprinted state plan] allows States to require a "spend-down" of an individual's resources, by indicating that excess liquid resources can be applied to the cost of medical care. Although section 1902(a)(17)(D) [42 U.S.C. § 1396a(a)(17)(D)] of the Social Security Act provides this option with respect to income (by taking into account incurred medical expenses), neither the Act nor Federal regulations allow for such flexibility with regard to resources. We have, therefore, eliminated this option on [the Medicaid preprinted state plan] to correct their error and reflect Federal law and regulations.
>
> ACTION REQUIRED: Submit the attached revised page to the Regional Medicaid Director by September 30, 1980.

DHS complied with this directive and eliminated the "spend-down" provision in connection with the determination of a Medicaid applicant's *resource* eligibility. The comparable federal regulation likewise no longer mentions a "spend-down" provision for resources, 42 C.F.R. § 435.845, although the provision remains for income eligibility, 42 C.F.R. § 435.831.

Petitioner maintains that before DHS could delete the "spend-down" of resources provision from its Medicaid state plan, it had to comply with the rulemaking procedures of the D.C.A.P.A., D.C.Code § 1–1501 *et seq.* (1981 & 1984 Supp.), citing

*Junghans v. Department of Human Resources,* 289 A.2d 17 (D.C.1972) and *District of Columbia v. Green,* 310 A.2d 848 (D.C.1973).

The D.C.A.P.A. defines a "rule" and "rulemaking" as:

> (6) The term "rule" means the whole or any part of any Mayor's or agency's statement of general or particular applicability and future effect designed to implement, interpret, or prescribe law or policy or to describe the organization, procedure, or practice requirements of the Mayor or of any agency.
>
> (7) The term "rulemaking" means Mayor's or agency's process for the formulation, amendment, or repeal of a rule.

D.C.Code § 1–1502(6), (7) (1981).

The D.C.A.P.A. further provides that rulemaking must be attended by public notice and participation prior to adoption of the rule, and publication of the final rule in the District of Columbia Register. *Id.* § 1–1506, –1538.

This court held in *Junghans* that the D.C.A.P.A. rulemaking requirements applied when the District amended the standards for public assistance programs. 289 A.2d at 25. There are, as petitioner notes, some similarities between a public assistance program and Medicaid. Both provide federal funds to the District for programs administered by the District, conditioned upon federal approval of state plans.

There exists, however, a major, and dispositive, distinction between the actions taken by the District in these two cases. In *Junghans,* the District had the choice "to enact one of ... several possible formulas for the payment of welfare assistance...." 289 A.2d at 22. This choice of program alternatives in *Junghans* required the administrative agency to "fully inform[ ] [itself] of the public's viewpoint

---

owned resources in the amount of $12,458.25 on the date of application. Medicaid regulations permitted a cash reserve of $2,500 on that date. Therefore, if petitioner's incurred medical bills exceeded the balance of $9,958.25, she presumably would have met the resource eligibility

standard. The applicant need not actually dispose of the excess resources by paying the medical bills by the date of application; the applicant need only incur the medical expenses. *See Casey v. D'Elia,* 87 A.D.2d 889, 449 N.Y.S.2d 531 (1982).

before making difficult and fundamental policy determinations...." *Id.*

 There was no such policy determination for the District to make here. The terms of the HHS transmittal made it clear that DHS had no choice but to delete the resource "spend-down" provision. HHS stated that "neither the Act nor Federal regulations allow for such flexibility with regard to resources." A participating state "may not ignore federal regulations simply because it interprets [the Act] in a manner it considers preferable to the Secretary's interpretation." *Herweg,* 455 U.S. at 277, 102 S.Ct. at 1067 (upholding HHS definition of "availability" of income for "optional categorically needy"). HHS clearly informed DHS that it was compelled almost immediately to revise its state Medicaid plan as directed. HHS permitted DHS no range of options. In short, DHS did not face a policy determination with the discretion to choose among alternatives.

The Medicaid eligibility change at issue is analogous to the food stamp program eligibility requirements held not to be "rules" for the purposes of the D.C.A.P.A. in *Wolston v. District of Columbia Department of Human Resources,* 291 A.2d 85 (D.C. 1972). The petitioner in *Wolston* argued that the District's food stamp coupon allotment schedules were invalid because the District did not publish them in accordance with the D.C.A.P.A. The food stamp program is a federally-aided program administered by the District according to a plan of operation approved by a federal agency, the Food and Nutrition Service (FNS). The schedule challenged by petitioner was prepared by FNS for inclusion in each state's plan. This court observed that "[p]etitioner's eligibility for food stamp coupons is therefore controlled by regulations of the Secretary as implemented by FNS, rather than any rule or regulation of the [District agency]." *Id.* at 87. The court declared that the food stamp schedules were not "rules" within the meaning of the D.C.A.P.A. *Id.* The decision also stressed that the District's action was "compelled" by

the federal agency. *Id.* at 88. We find that HHS similarly "compelled" DHS to determine resource eligibility without the "spend-down" option.

 Petitioner asserts that the action taken in *Wolston* is distinguishable from the Medicaid action here taken by DHS. Petitioner argues that in *Wolston* neither the District agency nor the federal agency changed any standards, but in the instant case both the District and federal agencies departed from a preexisting statutory interpretation. *Cf. District of Columbia v. North Washington Neighbors, Inc.,* 367 A.2d 143, 147 (D.C.1976) (distinguishing an administrative description of the effect of an existing rule or regulation from *Green* and *Junghans* on the basis that those cases involved changes in existing rules that were legislative in nature), *cert. denied,* 434 U.S. 823, 98 S.Ct. 68, 54 L.Ed.2d 80 (1977). That a change is involved here, however, makes the District's action no less compelled. The state Medicaid plan must be "amended whenever necessary to reflect new or revised Federal statutes or regulations." 45 C.F.R. § 205.5. Failure by DHS to adjust its state plan as directed would have permitted HHS to invalidate the plan, resulting in the loss of federal funds.

Petitioner next argues that DHS was not faced with the immediate forfeiture of federal funds because DHS could have sought administrative and judicial review through the detailed review mechanism provided for state participants by the Act and regulations. *See* 42 U.S.C. § 1316; 45 C.F.R. §§ 201.4, 201.7 (if HHS finds state plan to be nonconforming, state may petition HHS for administrative reconsideration and hearing; state may thereafter seek judicial review). Petitioner suggests that DHS had a choice: to accept the dictated eligibility standard, or to exercise its right to "test" the revision by administrative and judicial review.

 We do not agree that the decision of DHS to acquiesce in a federally mandat-

ed change, rather than challenge it administratively or judicially, is the kind of policy decision contemplated by the D.C.A.P.A. definition of rulemaking. The decision to challenge is not a "fundamental policy determination." *Cf. Junghans,* 289 A.2d at 22. DHS has no duty to initiate lawsuits to dispute mandatory federal requirements. "The DCAPA envisioned rulemaking as a quasi-legislative process...." *North Washington Neighbors,* 367 A.2d at 147. Public input may assist the agency in shaping the scope of the final regulation where there is a question of choosing among alternative public assistance payment formulas, *Junghans,* 289 A.2d at 22, selecting the level of assessment for real property, *Green,* 310 A.2d at 854, or setting the minimum level of participation in the federal emergency assistance program, *Rorie v. District of Columbia Department of Human Resources,* 403 A.2d 1148, 1153 (D.C. 1979). Public comment on the "spend-

down" of resources for Medicaid eligibility would not, however, affect DHS' inability to make a choice among alternatives. We thus hold that the implementation of a mandatory federal directive that permits no choice by the District, other than to initiate an administrative or judicial challenge, is not rulemaking under the D.C.A.P.A. Therefore, the change in DHS guidelines that eliminated the provision for "spend-down" of resources is not invalid for non-compliance with D.C.A.P.A. requirements. DHS' determination of ineligibility is

*Affirmed.*