*Notice: This opinion is subject to formal revision before publication in the Atlantic and Maryland Reporters. Users are requested to notify the Clerk of the Court of any formal errors so that corrections may be made before the bound volumes go to press.*

# DISTRICT OF COLUMBIA COURT OF APPEALS

No. 18-AA-664

RICHARD ELDRIDGE, ROSA LEE, AND EVA FREEMAN, PETITIONERS,

V.

DISTRICT OF COLUMBIA DEPARTMENT OF HUMAN SERVICES AND DISTRICT OF COLUMBIA DEPARTMENT OF HEALTH CARE FINANCE, RESPONDENTS.

On Petition for Review of Orders of the
District of Columbia Office of Administrative Hearings
(DHS-681-16)

(Hon. Jeremy Alper, Administrative Law Judge)

(Argued Jan. 21, 2020                    Decided April 8, 2021)

*Bradley E. Oppenheimer*, with whom *Jacob E. Hartman* and *Geoffrey M. Klineberg* were on the brief, for petitioners.

*Graham E. Phillips*, Assistant Attorney General, with whom *Karl A. Racine*, Attorney General for the District of Columbia, *Loren L. AliKhan*, Solicitor General, and *Caroline S. Van Zile*, Deputy Solicitor General, were on the brief, for respondents.

Before GLICKMAN and EASTERLY, *Associate Judges*, and FISHER, *Senior Judge*.[*]

---

[*] Judge Fisher was an Associate Judge at the time of oral argument. His status changed to Senior Judge on August 23, 2020.

GLICKMAN, *Associate Judge*: Petitioners ask us to review an order of the Office of Administrative Hearings (OAH) affirming the termination of their Medicaid benefits as participants in the District's home and community-based services program for persons who are elderly and individuals with physical disabilities. The Administrative Law Judge (ALJ) upheld determinations by the Department of Human Services (DHS) in 2016 and 2017 that petitioners did not meet applicable income requirements for continuing to receive those benefits because (1) petitioners' incomes exceeded the eligibility ceiling for "categorically needy" beneficiaries, and (2) petitioners did not show they had incurred sufficient medical costs to bring their remaining income below the considerably lower eligibility ceiling for "medically needy" beneficiaries (a requirement commonly referred to as "spending down"). The material facts supporting those determinations are not at issue; the dispute before us concerns the proper interpretation of federal and District of Columbia law and regulations governing petitioners' continuing Medicaid eligibility.

Petitioners present three claims of legal error. First, they argue that the ALJ accorded undue deference to respondents' interpretation of ambiguous provisions of federal law. Second, petitioners argue that respondents have misapplied federal law by promulgating different income eligibility levels for categorically and medically

needy Medicaid applicants in such a way as to create a "benefit cliff," whereby someone whose monthly income does not exceed the eligibility ceiling can receive full Medicaid coverage of their medical costs, but someone whose monthly income exceeds that ceiling, by however small an amount, can get no coverage at all until they have spent a substantial portion of their own modest income on medical costs. Third, petitioners argue that, instead of rescinding their eligibility for Medicaid when their incomes rose above the eligibility ceiling, respondents were required by "post-eligibility treatment of income" regulations to adjust the financial contributions petitioners were expected to make to the cost of their care in light of their higher incomes.

We conclude that petitioners are not entitled to relief. The ALJ did not accord undue deference to respondents' interpretation of federal law, but even if the ALJ had done so, a remand would be unnecessary because we construe the law ourselves *de novo*. On the merits, we hold that respondents did not misinterpret or misapply the law. Federal law permits jurisdictions to establish different income eligibility ceilings for categorically and medically needy Medicaid beneficiaries, and the post-eligibility treatment of income regulations do not apply to beneficiaries whose incomes rise above the applicable eligibility ceiling. We therefore affirm the termination of petitioners' benefits.

## I.  Medicaid Law and Regulations

The District of Columbia, at its option, participates in the federal Medicaid program, which provides "financial assistance to States that choose to reimburse certain costs of medical treatment for needy persons."[1]  In order to receive that assistance, the District must comply with the Medicaid Act and federal regulations implementing and interpreting it.[2]  The Act prescribes, among other things, the treatments and services the federal government will subsidize and the eligibility requirements beneficiaries must meet in order for the District to receive federal Medicaid funds.[3]

---

[1]  *Harris v. McRae*, 448 U.S. 297, 301 (1980).  The District is a State for the purposes of the Medicaid Act, 42 U.S.C. § 1396 *et seq*.  *See Hamer v. Dep't of Hum. Servs., Gov't of District of Columbia*, 492 A.2d 1253, 1254 n.1 (D.C. 1985) (citing 42 U.S.C. § 1301(a)(1)).

[2]  *Hamer*, 492 A.2d at 1255.  *See also Nat'l Fed'n of Indep. Bus. v. Sebelius*, 567 U.S. 519, 541–42 (2012).  The federal Medicaid regulations are promulgated and administered by the Department of Health and Human Services and the Centers for Medicare and Medicaid Services (CMS).  *See Wilder v. Va. Hosp. Ass'n*, 496 U.S. 498, 502 (1990); *Arkansas Dep't of Health and Hum. Servs. v. Ahlborn*, 547 U.S. 268, 275 (2006).

[3]  42 U.S.C. § 1396 *et seq*.

As pertinent here, the Medicaid program describes three classes of potential beneficiaries to whom an acceptable State Medicaid program must or may provide benefits with federal backing:  the "mandatory categorically needy," the "optional categorically needy," and the "medically needy."[4]

States (including the District) participating in Medicaid are required to provide benefits to "mandatory categorically needy" individuals.[5]  This category comprises certain groups of low-income people who "are receiving or deemed to be receiving cash assistance,"[6] including those who qualify for Supplemental Security Income for the Aged, Blind, and Disabled (SSI).[7]  To qualify for SSI and be considered mandatory categorically needy, a person's "countable income" — their total income minus certain deductions — must be less than the SSI benefit rate.  In

---

[4]  *See Consejo de Salud de la Comunidad de la Playa de Ponce, Inc. v. Gonzalez-Feliciano*, 695 F.3d 83, 90–91 (1st Cir. 2012); *Coye v. Dep't of Health & Human Servs.*, 973 F.2d 786, 789 (9th Cir. 1992); 42 C.F.R. § 435.4.

[5]  42 U.S.C. § 1396a(a)(10)(A)(i); *Consejo de Salud*, 695 F.3d at 90–91.

[6]  42 C.F.R. § 435.4; *see also Coye*, 973 F.2d at 789.

[7]  42 U.S.C. § 1396a(a)(10)(A)(i)(I) (state Medicaid plans must make medical assistance available to "all individuals . . . receiving aid or assistance under any plan of the State approved under subchapter . . . XVI [titled Supplemental Security Income for Aged, Blind, and Disabled]").

2017, the SSI benefit rate was $735 per month for an individual.[8]   None of the petitioners before us was in the "mandatory categorically needy" category.

States are permitted (but not required) to provide Medicaid benefits to other groups of low-income persons "who, generally, meet the categorical requirements or income or resource requirements that are the same as or less restrictive than those of the cash assistance programs and who are not receiving cash payments."[9]   This is known as the "optional categorically needy" category.   Prior to their terminations, petitioners qualified for Medicaid benefits under this category in connection with their participation in a Home and Community-Based Services (HCBS) waiver program established by the District in accordance with Section 1915(c) of the Medicaid Act.[10]   The District's program is called the Elderly and Individuals with Physical Disabilities (EPD) Waiver.[11]   Such "waiver" programs permit States to

---

[8]   *See* Cost-of-Living Increase and Other Determinations for 2017, 81 Fed. Reg. 74,854 (Oct. 27, 2016).

[9]   42 C.F.R. § 435.4; 42 U.S.C. § 1396a(a)(10)(A)(ii); *see also Herweg v. Ray*, 455 U.S. 265, 268–69 (1982).

[10]   *See* 42 U.S.C. §§ 1396n(c), 1396a(a)(10)(A)(ii)(VI); 42 C.F.R. § 435.217; *see also Olmstead v. L.C. ex rel. Zimring*, 527 U.S. 581, 601 & n.12 (1999).

[11]   *See* District of Columbia Dep't of Health Care Fin., *Application for a § 1915(c) Home and Community-Based Services Waiver* (Oct. 20, 2015)

provide support services (such as home health aides) enabling eligible Medicaid beneficiaries who otherwise would be institutionalized to continue residing in their homes and communities.[12] The Medicaid Act allows States to establish a countable income ceiling for HCBS waiver beneficiaries at the same elevated level as the States set for beneficiaries receiving long-term institutional care. That level, referred to as the Special Income Standard, or "SIS," may be up to 300% of the SSI benefit rate.[13] The District of Columbia set its Special Income Standard for EPD Waiver beneficiaries at this maximum allowed level.[14] In 2017, the District's SIS was $2,205 per month for individuals.[15]

Finally, the Medicaid Act allows States to extend coverage beyond the categorically needy to persons who qualify as "medically needy" because their

---

https://dhcf.dc.gov/node/193812 https://perma.cc/S2EX-GNJM (hereinafter EPD Waiver) https://perma.cc/4BZ4-NMZK; *see also* 29 D.C.M.R. §§ 9800.2(b), 9899.

[12] 29 D.C.M.R. § 9899.

[13] 42 U.S.C. §§ 1396a(a)(10)(A)(ii)(V), 1396b(f)(4)(C).

[14] EPD Waiver 43; 29 D.C.M.R. §§ 9801.1, 9899.

[15] In 2016, the applicable year in Mr. Eldridge's case, the District's SIS was $2,199 per month.

medical expenses are effectively impoverishing.[16]   Persons whose countable incomes exceed the eligibility ceiling for categorical neediness may become eligible to receive Medicaid benefits as medically needy "if they incur [medical costs] in an amount that effectively reduces their income"[17] to a "single income standard," termed the "medically needy income level" (MNIL).[18]   This income ceiling is not required to be the same as, or comparable to, the income ceiling for the categorically needy; the MNIL is not linked to the SSI benefit rate.   Instead, "Congress explicitly stated . . . that federal reimbursement for benefits provided to the medically needy was available only if the income of those persons, after the deduction of incurred medical expenses, was less than 133⅓% of the state AFDC [Aid to Families with Dependent Children] payment level."[19]   In setting the parameters for the MNIL,

---

[16]   *See* 42 U.S.C. § 1396a(a)(10)(C); *Atkins v. Rivera*, 477 U.S. 154, 157–58 (1986).

[17]   *Atkins*, 477 U.S. at 158.

[18] 42 C.F.R. §§ 435.811(a), 435.831(a)(1); *see also* 29 D.C.M.R. § 9800.2(c) ("Medically Needy Income Level").   This process is colloquially known as "spending down."

[19]   *Schweiker v. Hogan*, 457 U.S. 569, 586 (1982); *see* 42 U.S.C. § 1396b(f)(1)(B).   In *Hogan*, the Supreme Court rejected a constitutional equal protection challenge to the disparity between the MNIL and the higher income eligibility ceiling for the categorically needy.   457 U.S. at 587–88, 591–92. Although Congress subsequently repealed the AFDC program, the MNIL ceiling remains tied to the value of AFDC benefits as they existed in July 1996, subject to increases for inflation.   *See* 42 C.F.R. §§ 435.811(e), 435.1007; *see also* 42 U.S.C.

"Congress recognized that this amount could be lower than categorical assistance eligibility levels."[20] The MNIL in the District in 2017 was $643 per month for an individual.[21] Thus, the maximum qualifying countable income for receiving the District's EPD Waiver services is significantly lower for the medically needy than for the categorically needy.

To determine whether an applicant for, or an existing beneficiary of, the District's EPD Waiver is within one of the eligibility groups, respondent DHS[22] applies an income test, wherein certain deductions (e.g., Child Nutrition Payments,

---

§ 1396u-1(b)(2)(B), (f)(3). (The current codification of 42 C.F.R. § 435.1007 contains a scrivener's error: paragraphs (b)(1) and (b)(2) are mistakenly omitted. The full text of the regulation appears at Medicaid Program; Eligibility and Coverage Requirements, 58 Fed. Reg. 4908, 4934 (Jan. 19, 1993)).

[20] *Hogan*, 457 U.S. at 586.

[21] *See* 29 D.C.M.R. § 9899 (defining the MNIL as a percentage of federal poverty levels); Annual Update of the HHS Poverty Guidelines, 82 Fed. Reg. 8831, 8832 (Jan. 31, 2017) (identifying federal poverty levels for 2017). The MNIL is also subject to a floor. *See* 42 C.F.R. § 435.811(c). While it is unclear that the District's MNIL was the highest it could have been set under the Medicaid Act, petitioners do not claim the MNIL was below the floor.

[22] DHS processes Medicaid applications and determines eligibility, while respondent DHCF manages the District's Medicaid Plan and promulgates implementing regulations. *See* D.C. Code § 7-771.07 (2018 Repl.).

governmental housing assistance, etc.[23]) are taken from the applicant or beneficiary's gross income to calculate a gross countable income. Applicants and beneficiaries with countable incomes at or below the SIS qualify for categorically needy eligibility[24]; those "who ha[ve] gross countable income exceeding the SIS" are required "to spend down the excess income to the MNIL . . . to become financially eligible"[25] as medically needy.

Federal regulations also require States to calculate an amount each eligible beneficiary of institutional care or HCBS is expected to contribute to the cost of their care.[26] In a process referred to as "post-eligibility treatment of income" (PETI), DHS calculates this financial contribution by applying specified deductions to an eligible beneficiary's gross countable income; the amount of countable income that remains after those deductions is the amount the beneficiary is expected to contribute for their institutional or community care.[27] Among the required deductions for

---

[23] *See* 29 D.C.M.R. § 9801.5(a)-(w).

[24] *Id.* § 9801.1.

[25] *Id.* § 9801.6.

[26] 42 C.F.R. §§ 435.725, 435.726.

[27] 29 D.C.M.R. §§ 9804.4-9804.6.

HCBS beneficiaries is a "Community Maintenance Needs Allowance" (CMNA) intended to cover their cost of living.[28] A State "may set [the CMNA] at any level," provided it is "based on a reasonable assessment of need."[29] In the District, the CMNA is equal to the SIS.[30] Consequently, because only persons who have countable income at or below the SIS (or persons who spend down to the MNIL) are eligible for the EPD Waiver, their required PETI financial contribution is always zero.[31]

In accordance with federal regulations requiring periodic reassessment of Medicaid eligibility, DHS must determine the continuing eligibility of EPD Waiver beneficiaries at least every twelve months, and also whenever it receives new information that may affect a beneficiary's eligibility.[32] The reassessment process for existing beneficiaries mirrors the initial application process, in that the same countable income eligibility standards and PETI apply.

---

[28] *See id.* § 9804.4(b); 42 C.F.R. § 435.726(c)(1).

[29] 42 C.F.R. § 435.726(c)(1)(i).

[30] 29 D.C.M.R. § 9804.4(b).

[31] In contrast, because the needs allowance for institutionalized beneficiaries is much smaller, *see* 29 D.C.M.R. § 9804.4(a), they may have substantial financial contribution requirements.

[32] *See* 29 D.C.M.R. § 9501.14; 42 C.F.R. § 435.916(a), (b), (d).

## II. The Terminations of Petitioners' EPD Waiver Benefits

Petitioners are three District of Columbia residents who previously received HCBS pursuant to the EPD Waiver. In late 2016, DHS notified Mr. Eldridge that his EPD benefits would not be renewed because his countable income was above the SIS. At the time his benefits were terminated, Mr. Eldridge's income was $2,466 per month. Ms. Freeman and Ms. Lee received similar non-renewal notices in early 2017, because their monthly countable incomes were $2,387 and $2,314, respectively. Each petitioner requested a "fair hearing" before the OAH to contest DHS's determination of their ineligibility for benefits[33]; their cases were consolidated and DHCF was permitted to intervene. All parties agreed that an evidentiary hearing was unnecessary and asked the ALJ to decide the cases as a matter of law on cross-motions for summary adjudication.

Petitioners argued before the ALJ that they were optional categorically needy HCBS beneficiaries, and that in reassessing their eligibility to continue receiving the EPD Waiver services on which they depended, DHS should have applied PETI

---

[33] *See* 42 U.S.C. § 1396a(a)(3) (State Medicaid plans must provide "an opportunity for a fair hearing . . . to any individual whose claim for medical assistance under the plan is denied").

deductions to their gross incomes *before* applying the countable income test to determine whether they remained eligible for benefits. If computed in that way, petitioners' countable incomes would have been below the SIS level ($2,205 per month in 2017) and petitioners still would have been considered eligible as categorically needy. By not applying the PETI deductions in reassessing their income eligibility, petitioners argued, respondents subjected them to an unfair and legally unrequired "benefit cliff," since they would have to "spend down" on their care so as to reduce their net incomes to the MNIL ($643 per month) in order to be deemed "medically needy." No petitioner claimed to have satisfied that requirement.

In defending the termination of petitioners' benefits, respondents argued that the separate (two-stage) financial eligibility and PETI determinations, and the requirement that an individual whose countable income exceeds the SIS must spend down to the MNIL to become eligible for HCBS, were required by the Medicaid Act and applicable regulations.

The ALJ granted summary adjudication to respondents. Stating he had "independently analyzed the applicable federal and local law," the ALJ concluded that "[r]espondents' interpretation of the statutes and regulations at issue are not

inconsistent with the regulatory or statutory language or purpose, or otherwise unreasonable or improper under applicable law." The ALJ added that "[t]o the extent there may be ambiguity in the statutory and regulatory language, [r]espondents are due substantial deference."[34] Nowhere in his decision, however, did the ALJ identify an ambiguity in the law or say he was deferring to respondents to resolve an issue of interpretation.

The ALJ proceeded to determine whether petitioners qualified for the District's EPD Waiver under the applicable income requirements. Because petitioners were not SSI recipients, they did not qualify as mandatory categorically needy. Nor did they qualify as optional categorically needy, the ALJ concluded, as their countable incomes exceeded the SIS, and PETI could not be applied to reduce their incomes below that ceiling. Finally, the ALJ ruled that petitioners did not qualify as medically needy in the absence of any showing that they had spent down their incomes to the MNIL.

---

[34] Citing *Chevron U.S.A., Inc. v. N.R.D.C., Inc.,* 467 U.S. 837, 844 (1984), and *Auer v. Robbins,* 519 U.S. 452, 461–63 (1997).

### III. Standard of Review and the Question of Deference

Petitioners claim that the ALJ erroneously deferred to respondents' interpretation of ambiguous provisions in the Medicaid Act and the federal regulations implementing it, and that, based on the uncontested facts and a proper interpretation of the law, they were eligible to continue in the District's EPD Waiver program as categorically needy beneficiaries without having spent down their income to the MNIL level. These contentions challenge the ALJ's purely legal rulings, and our review is *de novo*.[35]

To determine whether the Medicaid Act and its implementing regulations authorize respondents' approach to the renewal of HCBS benefits, we look first to

---

[35] *See, e.g.*, *E.C. v. RCM of Washington, Inc.*, 92 A.3d 305, 313 (D.C. 2014) ("In reviewing an OAH decision, we determine whether: (1) OAH made findings of fact on each materially contested issue of fact, (2) substantial evidence supports each finding, and (3) OAH's conclusions flow rationally from its findings of fact. However, the construction of a statute raises a question of law which this court reviews *de novo*." (citations and quotation marks omitted)); *District of Columbia Dep't of Emp't Servs. v. Smallwood*, 26 A.3d 711, 714 (D.C. 2011) ("Our review of OAH decisions is limited, and we must affirm unless the decision is arbitrary, capricious, an abuse of discretion, or otherwise not in accordance with the law. We review the OAH's legal rulings *de novo*, recognizing that this court is the final authority on issues of statutory construction." (citations and quotation marks omitted)).

the language of those statutes and regulations, and construe their words "according to their ordinary sense and plain meaning."[36]  As a rule, if the language of a statute or agency regulation is unambiguous, our inquiry ends there; but where the text allows for more than one reading, we will defer to "an agency's interpretation of the statute and regulations it is charged by the legislature to administer, unless its interpretation is unreasonable or is inconsistent with the statutory language or purpose."[37]  Respondent DHCF is the single District agency responsible for the administration of the District's Medicaid program; accordingly, if we were to find

---

[36] *McCormick & Schmick Rest. Corp. v. District of Columbia Alcoholic Beverage Control Bd.*, 144 A.3d 1153, 1155 (D.C. 2016) (internal quotation marks omitted).

[37] *District of Columbia Dep't of the Env't v. E. Capitol Exxon*, 64 A.3d 878, 880–81 (D.C. 2013) (quotation marks omitted); *id.* at 881 ("This deference stems from the agency's presumed expertise in construing the statute it administers." (quotation marks omitted)).  "When, as here, the construction of an administrative regulation rather than a statute is in issue, deference is even more clearly in order." *Id.* at 881 (citation and quotation marks omitted).  We do not grant such deference to the OAH, however.  *Id.*  ("OAH, on the other hand, is vested with the responsibility for deciding administrative appeals involving a substantial number of different agencies and thus lacks the subject-matter expertise justifying the deference to agency interpretations of statutes or regulations.  It is also well established, then, that this court does not accord the same deference to the statutory interpretations of the Office of Administrative Hearings." (citations and quotation marks omitted)).

the relevant DHCF regulations ambiguous (which in this case we do not), we would grant appropriate deference to DHCF's interpretation of the ambiguity.[38]

DHS and DHCF are not, however, owed deference with respect to their interpretations of the federal Medicaid Act and regulations, as there is "no basis for assuming that Congress delegated any authority to [local agencies] to propound authoritative interpretations of either the statute or [the U.S. Department of Health and Human Services (HHS)]'s regulations."[39] Petitioners argue the ALJ thought otherwise and that this error entitles them to a remand for further proceedings before the OAH, in which the ALJ would interpret and apply federal law in their cases without deference to respondents' construction of it.[40] They base this argument on the ALJ's statement that "[t]o the extent there may be ambiguity in the statutory and regulatory language, [r]espondents are due substantial deference." Although that statement is overbroad if it is read as encompassing deference to respondents' interpretations of federal law, we are satisfied that the ALJ did not actually accord such deference. The ALJ explicitly stated he had "independently analyzed the

---

[38] D.C. Code § 7-771.07(1) (2018 Repl.).

[39] *DeCambre v. Brookline Hous. Auth.*, 826 F.3d 1, 19 (1st Cir. 2016); *see also Eyecare v. Dep't of Hum. Servs.*, 770 N.W.2d 832, 836 (Iowa 2009).

[40] *See, e.g.*, *E. Capitol Exxon*, 64 A.3d at 882.

applicable federal and local law," and his decision bears that out; he found no ambiguities in federal law and nowhere purported to defer to respondents' interpretation of an unclear provision in the Medicaid Act or the federal Medicaid regulations.  We therefore are assured that the putative error in the ALJ's brief statement regarding deference is innocuous and immaterial.[41]

---

[41] *See United Dominion Mgmt. Co. v. District of Columbia Rental Hous. Comm'n*, 101 A.3d 426, 430–31 (D.C. 2014).  In that case, the Commission had said, erroneously, that its review of an OAH ALJ's interpretation of the law was deferential; we held the error immaterial because the Commission demonstrably engaged in *de novo* review of the issues.  We explained:

> Although the RHC articulated its standard of agency review incorrectly, we decline to reverse on this ground, as we find that RHC's error was ultimately immaterial.  *See* D.C. Code § 2-510 (b) ("The Court may invoke the rule of prejudicial error."); *see also LCP, Inc. v. District of Columbia Alcoholic Beverage Control Bd.*, 499 A.2d 897, 903 (D.C. 1985) ("[R]eversal and remand is required only if substantial doubt exists whether the agency would have made the same ultimate finding with the error removed.").  Although the RHC said that it would defer to reasonable legal interpretations of the OAH ALJ, its orders demonstrate that it did not do so.  The RHC painstakingly analyzed "the plain language of the [Rental Housing] Act, the Act's legislative history, the Act's regulations, case law precedent, and the purposes of the Act" before announcing its conclusion.  Indeed, given the thorough nature of the RHC's decision and order affirming the ALJ's decision, it is apparent that the RHC's decision amounted to a *de novo* review of the legal issues . . . , even though the RHC did not acknowledge it as such.

But a remand to the OAH would not be necessary or appropriate even if it were otherwise. This court is the final arbiter of the legal issues at hand, and we can and will determine whether the ALJ's construction of the Medicaid Act is "in accordance with [the] law"[42] without according undue deference to respondents' interpretation of it.

## IV. Petitioners' Eligibility for EPD Waiver Benefits

Petitioners maintain that respondents' reassessment of their eligibility for EPD Waiver benefits violated the Medicaid Act and District regulations in two ways. First, they argue that respondents' spend-down requirement creates an impermissible "benefit cliff" by requiring them to spend-down to the MNIL rather than to the (considerably higher) SIS. Second, they argue that respondents' refusal to apply PETI during the financial eligibility determination contravenes federal law and respondents' own regulations, because it treats them as new applicants rather than as existing beneficiaries eligible to have deductions taken from their income to

---

*Id.* (internal citation omitted). Essentially the same rationale applies here.

[42] D.C. Code § 2-510(a)(3)(A) (2016 Repl.).

determine their share of the cost of care.  For the following reasons, we disagree with both contentions.

### A.  The "Benefit Cliff"

Petitioners premise their first challenge on the notion that respondents have set two different income qualification levels for HCBS applicants:  "SIS ($2,205 per month) for those qualifying without spend-down, and a much lower Medically Needy Income level ($643 per month) for those initially above SIS who can spend down through medical expenses."[43]  The use of two different standards, petitioners argue, violates the federal requirement that there be a "single income standard" for medically needy individuals[44] and creates an unfair "benefit cliff" imperiling any beneficiary whose countable income rises by even a single dollar above the SIS.  We sympathize with petitioners and other Medicaid beneficiaries confronting this "cliff," but their legal argument lacks merit, for two reasons.

First, respondents do not use two income standards for medically needy beneficiaries.  The applicable regulation, 29 D.C.M.R. § 9899, unambiguously

---

[43]  Br. for Pet'rs at 23–24.

[44]  *See* 42 C.F.R. § 435.811(a).

provides a single definition of the MNIL: "Fifty percent (50%) of the Federal Poverty Level (FPL) for a household of two (2) or larger; the MNIL for a household of one is ninety-five percent (95%) of that for a household of two." Petitioners cite no other District regulation that authorizes the use of a different MNIL, and there is no indication that respondents have ever used, in determining an applicant's or beneficiary's Medicaid eligibility, the SIS as the MNIL as opposed to the figure defined in § 9899. Respondents have consistently represented that there is one MNIL for petitioners, which was $643 per month in 2017.[45]

---

[45] In furtherance of their position, petitioners point to a passage in respondents' motion for summary adjudication before the OAH in which respondents referred to two "medically needy" categories. The two categories respondents described were "individuals who have an income of no more than 300% of the SSI federal benefit payment level and individuals who have an income that exceeds 300% of the SSI federal benefit payment level." While respondents referred to both categories as "medically needy," that was merely infelicitous phrasing, because (as we have explained above) individuals with incomes at or below 300% of the SSI benefit level qualify as *categorically needy* without having to spend down to the MNIL to (superfluously) meet the income qualification for being deemed *medically needy*. Thus, in their motion for summary adjudication, respondents proceeded to describe *one* spend-down process and *one* MNIL. Because a "medically needy" individual is by definition a person who has *met* the spend-down requirements set by a State, *see* 42 C.F.R. § 435.4 (defining "medically needy" as persons "not . . . categorically needy but who may be eligible for Medicaid . . . because . . . their income and resources are within [State-determined] limits . . . after their incurred expenses for medical or remedial care are deducted"), we are of the view that the single spend-down process respondents described in their briefing below establishes that respondents have not implemented more than one medically needy income standard.

Second, requiring petitioners and others with countable incomes above the SIS to spend down to the much lower MNIL (instead of just to the SIS) in order to qualify as medically needy does not create a legally *improper* benefit cliff, for the simple reason that benefit cliffs are an accepted part of the Medicaid universe that Congress foresaw and intended.

The Supreme Court explained and sanctioned the reality of Medicaid benefit cliffs in *Schweiker v. Hogan*. There, a group of individuals, whose incomes exceeded the ceiling on qualifying for Medicaid as categorically needy, argued that the medically needy spend-down requirement was unconstitutional and violated the Medicaid Act because it mandated that they spend down their incomes to an amount lower than the categorically needy income limit.[46] The Court held that Congress specifically intended differing income standards for the categorically needy and the medically needy by choosing to set the MNIL, but not the categorically needy income ceiling, at a maximum of 133⅓ percent of the AFDC payment rate.[47] That choice, the Court explained, was "not inconsistent with constitutional principles of equal treatment"; rather, it reflected a reasonable decision to prioritize the provision

---

[46] 457 U.S. at 571.

[47] *Id.* at 586–87.

of medical benefits to categorically needy persons over the provision of benefits to those persons who were comparatively wealthy by authorizing coverage of the latter only if they had medical expenses *so* substantial that their incomes reached a significantly lower level.[48]

There is no distinction between the benefit cliff upheld in *Hogan* and the one at issue in this case. The District is not required to include the medically needy in its EPD Waiver at all,[49] and where it has chosen to include such individuals in its waiver, it is statutorily prevented from raising the MNIL to the level at which the

---

[48] *Id.* at 587, 591–93; *see also State of Cal., Dep't of Health Servs. v. Dep't of Health & Hum. Servs.*, 853 F.2d 634, 636 (9th Cir. 1988) ("The medically needy may qualify for financial assistance if they incur medical expenses in an amount that effectively reduces their income below that of the categorically needy.").

[49] *See Skandalis v. Rowe*, 14 F.3d 173, 181–83 (2d Cir. 1994) (holding that the State of Connecticut may exclude the medically needy from its HCBS Waiver program); Centers for Medicare & Medicaid Services, *Application for a § 1915(c) Home and Community-Based Waiver: Instructions, Technical Guide and Review Criteria* at 90 (2019) https://www.hhs.gov/guidance/sites/default/files/hhs-guidance-documents/instructions_technicalguide_v3.6_10.pdf, HTTPS://PERMA.CC/W85R-T563 (hereinafter CMS Guidance) ("If a[n eligibility] group is included in the Medicaid state plan, a state *has the option* to include the group in the waiver." (emphasis added.)).

District has set its SIS.[50]  In point of fact, CMS guidance to the States and the District explicitly advises that "a medically needy individual with income over the special income level cannot spend down to the special income level and be eligible under the § 435.217 [optional categorically needy] group."[51]  Petitioners have not identified any applicable provision of the Medicaid Act nor any federal regulation contrary to that guidance.[52]

---

[50] 42 U.S.C. § 1396b(f)(1)(B); *see also Hogan*, 457 U.S. at 586–87; 42 C.F.R. §§ 435.811(e), 435.1007(b)(1).

[51] CMS Guidance, at 91.  We consider such guidance persuasive, though it is not necessarily entitled to the deference owed to formal federal rule-making.  *See, e.g.*, *Christensen v. Harris Cty.*, 529 U.S. 576, 587 (2000); *Nunnally v. District of Columbia Metro. Police Dep't*, 80 A.3d 1004, 1012 & n.17 (D.C. 2013); *Wong v. Doar*, 571 F.3d 247, 258–60 (2d Cir. 2009) (according so-called *Skidmore* deference, rather than *Chevron* deference, to CMS interpretive guidance of Medicaid Act).

[52] There are special situations in which Medicaid beneficiaries are not required to spend down to the MNIL when their countable incomes exceed SIS.  For example, under 42 U.S.C. § 1382h(b), SSI beneficiaries may retain their Medicaid benefits with a monthly income in excess of the SIS, under certain conditions, if they return to work.  This provision amounts to a work-incentive exception for SSI beneficiaries who might otherwise choose not to work for fear of their incomes increasing beyond the SSI benefit rate such that they would lose their Medicaid coverage.  Under 42 U.S.C. § 1396a(a)(10)(A)(i)(I), the District is *required* to provide Medicaid benefits for such persons, because they, unlike petitioners, remain SSI beneficiaries who are mandatory categorically needy.

HHS has recognized the precarious position in which this scheme puts individuals whose incomes exceed categorically needy limits, noting that because the MNIL is so "very low" it may require individuals who have no other way to qualify for benefits to spend down large portions of their meager incomes, to a level lower than that at which they would qualify as SSI beneficiaries in some states.[53] Even so, the Department has concluded that Congress has tied the District's hands here — "[u]nder the Medicaid statute, States cannot just increase their medically needy income levels to deal with this problem."[54]

## B. Post-Eligibility Treatment of Income

Petitioners alternatively argue that even if they are not eligible for benefits as medically needy unless they spend down to the MNIL, they remain optional categorically needy despite the rise in their countable incomes, because the Medicaid Act distinguishes between the financial eligibility requirements for "initial"

---

[53] Medicaid Program; Change in Application of Federal Financial Participation Limits, 66 Fed. Reg. 2316, 2319–20 (Jan. 11, 2001) (authorizing a rule change regarding the method by which a State may calculate an individual's countable income for purposes of determining Medicaid eligibility in order to reduce the number of beneficiaries subject to spend-down); *see also* 58 Fed. Reg. at 4923 (calling the MNIL ceiling "fundamentally restrictive").

[54] 66 Fed. Reg. at 2320.

applicants for Medicaid and existing beneficiaries. Under their view of the Act, petitioners, having been deemed eligible initially for Medicaid and enrolled in the EPD Waiver, are "beneficiaries" to whom the District's income test for HCBS eligibility no longer applies, and "for whom any excess income simply becomes a copay determined independently of the spend-down level."[55] In support of this "copay" argument, petitioners cite 29 D.C.M.R. § 9804.1, which provides that the income deductions for PETI are applicable "after an *initial* eligibility determination." (Emphasis added.) Essentially, petitioners contend that existing beneficiaries, who had their "initial" eligibility determination when they first applied for Medicaid, may never have their eligibility reassessed; rather, DHS may *only* conduct "a simple recalculation of their expected contributions."[56]

As we have explained, respondents do not understand or apply PETI in the manner petitioners propose. They apply the income eligibility requirements in 29 D.M.C.R. § 9801 for beneficiaries during the renewal process the same way they do for first-time applicants. Thus, only after a beneficiary meets those requirements (i.e., has a countable income at or below the categorically needy income ceiling or

---

[55] Br. for Pet'rs at 27.

[56] Reply Br. at 17.

spends down to the MNIL) do respondents deduct the applicable CMNA (among other deductions) to determine the beneficiary's contribution to their cost of care. But petitioners argue that redetermining eligibility anew before the PETI contribution determination violates § 9804.1's language stating PETI must take place "after an initial eligibility determination."

It is hard for us to see how petitioners' argument squares with the federal requirements, noted above, that eligibility for Medicaid benefits be reassessed periodically,[57] and that a State must "make two separate determinations: (1) whether an individual is 'eligib[le] for' Medicaid and, if so, (2) the 'extent of' benefits to which he is entitled," with "[b]oth determinations . . . informed by an individual's available 'income' and 'resources.'"[58] And petitioners' reading of § 9804.1 conflicts with the plain language of other applicable sections of 29 D.C.M.R.: notably, § 9801.1, which states that in order to be eligible for HCBS, "an applicant *or beneficiary* shall have gross countable income at or below the . . . [SIS]," and

---

[57] 42 C.F.R § 435.916(a) mandates that Medicaid eligibility, including "financial eligibility," must be renewed on at least a yearly basis. Consistent with this requirement, 29 D.C.M.R. § 9501.14 provides that "[t]he Department shall renew eligibility every twelve (12) months for all beneficiaries, except for beneficiaries deemed eligible for less than one (1) year."

[58] *Wong v. Doar*, 571 F.3d 247, 251 (2d Cir. 2009) (citing, *inter alia*, 42 U.S.C. § 1396a(a)(17)).

§ 9801.6, which states that "[a]n applicant *or beneficiary* who has gross countable income exceeding the SIS shall be permitted to spend down the excess income to the MNIL . . . to become financially eligible." (Emphases added.) It is a "basic" interpretative principle that "each provision of the [regulation] should be construed so as to give effect to all of the [regulation's] provisions, not rendering any provision superfluous."[59]

In our view, the only reasonable interpretation of the regulations is that the reference in § 9804.1 to an "initial eligibility determination" simply means that determination of eligibility comes first, i.e., is the first step of a two-step process for both applicants and existing beneficiaries when their Medicaid eligibility is subject to periodic reassessment. The regulation does not create a means of evading redeterminations of eligibility or enabling beneficiaries to remain eligible indefinitely regardless of increases in their incomes. Rather, after an "initial"

---

[59] *Carlson Constr. Co. v. Dupont W. Condo., Inc.*, 932 A.2d 1132, 1136 (D.C. 2007) (quoting *Thomas v. District of Columbia Dep't of Emp't Servs.*, 547 A.2d 1034, 1037 (D.C. 1988)). *See also Rudolph v. United States ex rel Gillott*, 37 App. D.C. 455, 460 (D.C. Cir. 1911) ("In the construction of a statute [or regulation] it is the duty of the courts to consider the whole, and, if reasonably possible, to reconcile one part with another, so that due effect may be given to each."); *Rupsha 2007, LLC v. Kellum*, 32 A.3d 402, 410–11 (D.C. 2011) (choosing interpretation that is "consistent with the regulatory scheme"); *Greenbrier Hosp., LLC v. Azar*, 974 F.3d 546, 550 (5th Cir. 2020) ("Ordinarily, [courts] try to reconcile potentially conflicting provisions [in a regulation] by attempting to read the text in harmony.").

renewal of a beneficiary's eligibility based on whether they continue to meet the applicable income test, their income is run through the PETI deductions that determine their required financial contribution, if any, to their cost of care. Thus, we agree with respondents that District regulations mandate they apply the income test and then the PETI deductions during each renewal of an existing beneficiary's eligibility, and not only upon the first determination of their eligibility.

Petitioners argue that this application of the PETI regulations cannot be correct. They reason that with the CMNA deduction for EPD Waiver beneficiaries equal to the SIS, applying PETI after eligibility is determined means those beneficiaries will never have to defray the District's payments under the program. This, petitioners argue, violates the federal requirement that States "must reduce [their] payment for home and community-based services" by the amount of countable income remaining after PETI deductions.[60] However, no provision of federal law prevents a State from setting the maintenance needs allowance at an amount that reduces a beneficiary's required copay to zero; the applicable federal regulation allows the District to set the CMNA "at any level, as long as . . . [t]he

---

[60] 42 C.F.R. § 435.726(a).

deduction amount is based on a reasonable assessment of need."[61] There is no claim that the District's assessment of need is unreasonable.[62] And petitioners point to nothing in federal law that would require the District to utilize PETI to do even more and protect beneficiaries whose incomes rise above the eligibility level from losing their coverage.

Petitioners have represented to this court that some States have structured valid Medicaid plans that effectuate a more favorable approach to the renewal of HCBS benefits for beneficiaries whose incomes rise above the categorically needy eligibility ceiling. That may be so; the Medicaid Act is designed, to some extent, to give States "flexibility" in administering their programs, in order to incentivize both participation in Medicaid and "innovation and experiment[ation]" in approaches to health care for the needy.[63] But petitioners' proposed approach is not required by

---

[61] 42 C.F.R. § 435.726(c)(1)(i).

[62] Further to the point, CMS has acknowledged the District's approach as common and not improper, and has even authorized States to "increase the maintenance needs allowance for waiver participants *above* [SIS]" in order to protect income that is excluded from countable income for eligibility purposes. CMS Guidance at 94 (emphasis added).

[63] *Skandalis*, 14 F.3d at 181.

(and, as formulated, appears to be inconsistent with) federal law; we have no authority to order the District to abandon its own legally valid plan.

## V. Conclusion

We conclude that petitioners' countable incomes rendered them ineligible under federal and local law and regulations for EPD Waiver benefits as categorically needy recipients, and that petitioners have not established their eligibility to receive those benefits as medically needy recipients. We therefore affirm the final order of OAH upholding the termination of petitioners' benefits.